UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GEORGE JOHN KUCHMA,

                              Plaintiff,

                                                     6:19-CV-766
v.                                            (GTS/TWD)


CITY OF UTICA, JOHN ABEL,

                            Defendants.
_____

APPEARANCES:

GEORGE JOHN KUCHMA
Plaintiff, *pro se*
905 Saratoga Street
Apartment 3
Utica, New York 13502

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

      *Pro se* Plaintiff George John Kuchma ("Plaintiff") filed a civil complaint against the City of Utica (the "City") and Sergeant John Abel ("Sergeant Abel") of the Utica Police Department (collectively "Defendants") alleging Defendants violated his constitutional rights.  (Dkt. No. 1.) Currently before the Court is Plaintiff's application to proceed *in forma pauperis* ("IFP Application").  (Dkt. No. 2.)  As noted herein, the Court grants Plaintiff's IFP Application, necessitating further review relative to whether the pleading meets 28 U.S.C. § 1915(e)'s sufficiency standards.  For the reasons discussed below, the Court finds Plaintiff's complaint fails to state a claim for which relief can be granted and, therefore, recommends Plaintiff's complaint be dismissed with leave to replead.

## I.    PLAINTIFF'S IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  After reviewing Plaintiff's IFP Application, the Court finds Plaintiff meets this standard.  Therefore, Plaintiff's IFP Application (Dkt. No. 2) is granted.

## II.    SUFFICIENCY OF THE COMPLAINT

### A.    Standard of Review

28 U.S.C. § 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). Moreover, a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

**B.    Summary of the Complaint**

In September 2017, Plaintiff visited a Stewarts Shop at 425 Court St. in Utica, New York and was accused of shoplifting and told not to return.  (Dkt. No. 1 at ¶ 1.)  Nearly a year later, at 5:00 a.m. on August 29, 2018, Plaintiff went to the same Stewarts Shop to purchase a pack of cigarettes.  (*Id*. at ¶ 2.)  Plaintiff alleges he purchased cigarettes with no incident and went to an outdoor picnic table to smoke a cigarette.  (*Id*. at ¶¶ 3, 4.)  He noted two Utica Police Officers were near him and he engaged the officers in conversation.  (*Id*. at ¶¶ 5, 6.)  One of these officers was Sergeant Abel.  (*Id*. at ¶ 5.)

According to Plaintiff, Sergeant Abel asked Plaintiff whether he knew the manager of the Stewarts Shop did not want Plaintiff on the property.  (*Id*. at ¶ 7.)  Plaintiff replied the previous incident occurred nearly a year ago and he had just bought cigarettes, so he did not think it was a problem.  (*Id*. ¶ 8.)  Plaintiff asserted he told the officers he would leave after using the free air pump to re-fill air in his bicycle tire.  (*Id*. at ¶ 9.)

Rather than letting him leave, Plaintiff alleges Sergeant Abel placed Plaintiff under arrest and ordered him to put his hands behind his back.  (*Id*. at ¶ 10, 11.)  Plaintiff asserts he obeyed Sergeant Abel's orders and Sergeant Abel "tightly applied hand cuffs."  (*Id*. at ¶ 12.)  According to Plaintiff, Sergeant Abel then pulled on the handcuffs hard enough to cut into the skin on his left wrist.  (*Id*. at ¶ 13.)  Plaintiff was next placed in the rear of a police car and transported to the police station for processing.  (*Id*. at ¶ 14.)  Plaintiff stated the booking officer noted his hands were bloody when he removed his handcuffs.  (*Id*. at ¶ 16.)  Plaintiff asserts he spent approximately 45 minutes in the handcuffs.  (*Id*. at ¶ 18.)  Plaintiff was issued a citation for trespassing.  (*Id*. at ¶ 15.)

Based on the foregoing, Plaintiff asserts two causes of action pursuant to 42 U.S.C. § 1983.[1]  First, Plaintiff alleges Sergeant Abel did not have probable cause to arrest him for trespassing and, therefore, his detainment violated the Fourth Amendment to the United States Constitution.  (*Id*. at ¶¶ 19-23.)  Second, Plaintiff alleges the level of force used to effectuate his arrest was unreasonable in violation of the Fourth Amendment's prohibition against excessive force.  (*Id*. at ¶¶ 24-28.)

**C.    Analysis[2]**

As recounted above, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, alleging claims sounding in excessive force and false arrest.  (Dkt. No. 1.)  As a general matter, section 1983 "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)).  "Section 1983 'is not itself a source of substantive rights[,]' . . . but merely provides 'a method for vindicating federal rights elsewhere conferred[.]'"  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 (1979)).  To state a claim pursuant to section 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'"  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

---

[1]  Though Plaintiff does not specify which Defendant he is suing as to each claim, the Court assumes Plaintiff intended to assert each claim against each defendant.

[2]  The Court notes Plaintiff failed to plead whether he filed a notice of claim with the City of Utica prior to filing this lawsuit.  *See* N.Y. Gen. Mun. Law § 50-e.  For the present purposes, the Court assumes Plaintiff filed a notice of claim.

1.    <u>Sergeant Abel</u>

a.    *False Arrest*

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted).  "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law."  *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Id*. (internal quotation marks omitted).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  Even without probable cause to arrest, "an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."  *Escalera*, 361 F.3d at 743.  "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  *Id*. (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (stating that, "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity") (citations omitted).  The test for qualified immunity is "more favorable to the officers than the one for probable cause." *Escalera*, 361 F.3d at 743.

Even the most generous reading of Plaintiff's complaint reveals Sergeant Abel had at least arguable probable cause to arrest Plaintiff for criminal trespass.  Under New York law, a "person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  N.Y. Penal Law § 140.05.  "A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege *unless he defies a lawful order not to enter or remain*, personally communicated to him by the owner of such premises or other authorized person."  *Id*. § 140.00(5) (emphasis added).  As Plaintiff asserted in his complaint, less than one year before his arrest store employees told him not to return to the Stewarts Store.  (Dkt. No. 1 at ¶ 1.)  Moreover, on the day of Plaintiff's arrest, he reported Sergeant Abel told him the store manager did not want him on the property.  (*Id*. at ¶ 7.)  Though Plaintiff alleges he told the arresting officers he purchased cigarettes at the property and believed he was permitted to be on the premises (Dkt. No. 1 at ¶ 8), once the officers had a reasonable basis for believing he was trespassing, they were "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

Under the circumstances presented, the Court finds Sergeant Abel had, at the very least, arguable probable cause to arrest Plaintiff "notwithstanding [his] protestations of innocence."  *Ricciuti*, 124 F.3d at 128; *see also Russell v. Journal News*, 672 F. App'x 76, 80-81 (2d Cir. 2016) (summary order).  Accordingly, the Court recommends Plaintiff's claim for false arrest be dismissed, with leave to re-plead.

### b.    *Excessive force – tight handcuffing*

Law enforcement officers' use of force in an arrest is excessive in violation of the Fourth Amendment if it is "objectively unreasonable in light of the facts and circumstances confronting

them, without regard to the officers' underlying intent or motivation." *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). Specifically, with respect to an excessive force claim based on the use of handcuffs, courts evaluate the reasonableness of the force used in light of the following factors: (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. *See Jackson v. Village of Ilion*, 2016 WL 126392, at *7 (N.D.N.Y. Jan. 11, 2016); *Dunkelberger v. Dunkelberger*, 2015 WL 5730605, at *14 (S.D.N.Y. Sept. 30, 2015); *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citing cases). "This particularized standard reflects the need to balance the right to use some degree of coercion, including the use of tight handcuffs to prevent the arrestee's hands from slipping out, with the use of overly tight handcuffing that could constitute excessive force." *Dunkelberger*, 2015 WL 5730605, at *14 (citations and quotation marks omitted). Accordingly, there is a consensus among district courts in the Second Circuit that "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Id*. (quoting *Usavage*, 932 F. Supp. 2d at 592 (brackets and internal quotation marks omitted)).

Here, Plaintiff failed to allege the necessary elements of an excessive force claim predicated on tight handcuffs. To that end, Plaintiff does not allege Sergeant Abel ignored his pleas that his handcuffs were too tight. (Dkt. No. 1.) The Court similarly finds Plaintiff's allegations of a handcuff related injury does not satisfy the elevated standard for excessive force claims involving handcuffs. *See, e.g. Dunkelberger*, 2015 WL 5730605, at *14. Consequently, the Court finds Plaintiff's claim is deficient on its face and the Court recommends Plaintiff's claim for excessive force be dismissed, with leave to re-plead.

2.    City of Utica

While amenable to suit under section 1983, a municipality may not be held liable under that section for the acts of its employees based on a theory of respondeat superior.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Blond v. City of Schenectady*, No. 10-CV-0598, 2010 WL 4316810, at *3 (N.D.N.Y. Oct. 26, 2010).  To sustain a section 1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and the violation resulted from an identified municipal policy or custom.  *Monell*, 436 U.S. at 694-695.

An "official policy or custom" can be shown in several ways: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent it amounts to deliberate indifference to the rights of those who come in contact with the municipal employees.  *Dorsett–Felicelli, Inc. v. Cty. of Clinton*, 371 F. Supp. 2d 183, 194 (N.D.N.Y. 2005) (citing *Monell*, 436 U.S. at 690-91).  "Custom denotes persistent and widespread practices, and thus proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . ."  *Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 139 (N.D.N.Y. 2006) (punctuation and citation omitted).

Plaintiff does not articulate an independent basis to hold the City liable in his complaint.  Rather, his claims are all related to Sergeant Abel's individual actions on a specific date.  Thus, because Plaintiff does not appear to be asserting an independent claim against the City, the Court recommends the City of Utica to be dismissed from this lawsuit with leave to replead.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**;[3] and it is further

**RECOMMENDED** that the Complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** as against the City of Utica; and it is further

**RECOMMENDED** that the Complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** as against Sergeant Abel; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: July 30, 2019
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[3]  Plaintiff should note that although his IFP application has been granted, Plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

Case 6:19-cv-00766-GTS-TWD    Document 4    Filed 07/30/19    Page 11 of 41

Jackson v. Village of Ilion, New York, Not Reported in Fed. Supp. (2016)

2016 WL 126392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael J. JACKSON, Plaintiff,

v.

The VILLAGE OF ILION, NEW YORK, Ryan
C. Pavlot, Individually and as a police officer
of the Ilion Police Department, and Jason E.
Monahan, Individually and as a police officer
of the Ilion Police Department, Defendants.

6:14-CV-563
|
Signed 01/11/2016

**Attorneys and Law Firms**

Office of Stephen L. Lockwood, 285 Genesee Street, Daniel
N. Cafruny, Esq., Stephen L. Lockwood, Esq., of Counsel,
Utica, NY 13501, for Plaintiff.

Murphy, Burns Law Firm, 226 Great Oaks Boulevard,
Thomas K. Murphy, Esq., of Counsel, Albany, NY 12203, for
Defendants.

**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 *1  This civil action arises out of the detention of
plaintiff Michael Jackson ("Jackson" or "plaintiff") during
the execution of a search warrant at 514 Church Street
in Herkimer, New York in connection with a criminal
investigation into Brandon McNair, a suspected cocaine
dealer. Plaintiff, who is unrelated to McNair or his family,
became mixed up in this affair because he rents a room in the
McNair's three-story Church Street home.

Jackson asserts claims pursuant to 42 U.S.C. § 1983 and
state law alleging excessive force, failure to intervene, assault,
battery, and negligence against the Village of Ilion (the
"Village") as well as Ryan Pavlot ("Pavlot") and Jason
Monahan ("Monahan"), the two Village police officers
identified as being directly involved in detaining plaintiff
during law enforcement's execution of the search warrant.

Following the completion of discovery, the Village, Pavlot,
and Monahan (collectively "defendants") moved pursuant to
Federal Rule of Civil Procedure ("Rule") 56 for summary
judgment on all of Jackson's claims. Plaintiff opposed. The
motion was fully briefed and oral argument was heard on
December 18, 2015 in Utica, New York. Decision was
reserved.

**II. BACKGROUND** [1]

On October 4, 2013, Herkimer County Court Judge John H.
Crandall issued a warrant authorizing a search of the "entire
residence" at 514 Church Street. Defs.' Ex. A. Specifically,
this "no-knock" warrant permitted law enforcement officials
to search the home, as well as "any persons located therein,"
for cocaine and "any evidence that tends to demonstrate that
a drug related offense was committed." Id.

At the time, police possessed information that indicated "four
to five" individuals were regularly living at the house, and that
Brandon McNair—the primary target of the investigation—
was "known to have a hand gun and deal[ ] drugs from inside
of the residence." Defs.' Ex. B. A joint task force from the
Ilion and Herkimer police departments planned to execute this
search warrant early in the morning of October 11, 2013. Id.
As Officer Pavlot explained, their task that morning was "to
look for guns and drugs and control the scene until we could
make sure that the scene was safe." Pavlot Dep. at 5 and 9.

 *2  On the morning in question, Jackson awoke from his
third-floor bedroom around 6:30 a.m. and descended to the
second-floor kitchen, which he shared with several members
of the McNair's extended family, to make coffee and start his
day. Jackson Exam at 35. Plaintiff suffers from cerebral palsy,
a type of permanent movement disorder that affects his lower
limbs and makes it more difficult for him to walk. Id. at 14.

According to Jackson, he was still in the second-floor kitchen
around 7:00 a.m. when he heard people running up the stairs,
shouting "Police warrant, open up. Freeze." Jackson Exam at
37. Several officers entered the kitchen and plaintiff complied
when they initially told him to get down on the ground. [2] Id.
at 38.

After officers performed a quick search of the third-floor attic
area, "three or four" officers came back to where Jackson was
located on the floor of the second-floor kitchen and instructed
him to put his hands behind his back. Jackson Ex am at
38-39. Plaintiff responded "I can't" and asserts that he "told

Case 6:19-cv-00766-GTS-TWD    Document 4    Filed 07/30/19    Page 12 of 41

Jackson v. Village of Ilion, New York, Not Reported in Fed. Supp. (2016)

them [he] had a disability." Id. When the officers nevertheless insisted that he comply, plaintiff "asked if [he] could put [his hands] in the front of [himself]." Id. at 40. The officers refused plaintiff's request. Id.

Jackson states that the officers then began to handcuff him, managing to get plaintiff's right arm behind his back before they "grabbed [his left] arm and tried to put it behind [his] back." Jackson Exam at 40. Plaintiff claims "[t]hey were really clenching up on [his hands] pretty hard" at this time. Id. After a few moments, the officers managed to put handcuffs on plaintiff. [3] Id. at 41. Plaintiff asserts that the officers "wrench[ed]" his left arm behind his back during this handcuffing. Id. at 101.

According to Jackson, the officers then instructed him to stand up. Jackson Exam at 42. When he again responded "I can't," plaintiff states that the officers "helped [him] up"—as plaintiff explained, he rolled onto his side, then managed to get his knees underneath him before both officers "helped [him] up the rest of the way." Id. Plaintiff states that the officers accomplished this last bit by standing at his sides and holding onto his arms as he achieved this standing position. [4] Id. at 47. These two officers would later be identified as Pavlot and Monahan.

Jackson asserts he had just managed to stand up when "[o]ne of [the defendants] kind of pushed into [him] and [he] fell forward." Jackson Exam at 48. When pressed about this, plaintiff explained that "one of them"—either Pavlot or Monahan, but he was unsure of which—had let go of one of his arms, and at around that same time, the other officer "pushed into [him] with like his shoulder or body" and caused him to "hit [his] head on the microwave," which was located on a nearby countertop. Id. at 49. [5] When further questioned about what he meant by the word "push," plaintiff explained that he meant "it was sort of on purpose but wasn't [the officer's] intention," but seemed to have occurred because the officers were "being so forceful." Id. at 96.

*3 Pavlot and Monahan do not deny that any of these events occurred, but add one salient detail—while they were helping him to his feet, plaintiff informed them that his pants were falling down. Pavlot Dep. at 19. Defendants assert they were reaching down to pull plaintiff's pants up at the time plaintiff fell forward and struck his head on the microwave. [6] Id. at 20. According to Officer Monahan, "the cuffs on the bottom of [plaintiff's] pants were underneath onto his socks," making

it a possible danger for walking downstairs. [7] Monahan Dep. at 12.

The officers then patted Jackson down and escorted him to the second-floor stairwell, where they asked him to walk downstairs. Jackson Exam at 50. Plaintiff again replied that he couldn't, because he needed to use the railing for help descending the stairs. Id. at 61. Plaintiff further explains:

> Actually, I kind of argued with them for a little bit. I said, "I can't go down the stairs," and they insisted and I was like, "I can't go down the stairs."

Id. At this point, the parties' respective versions of events briefly diverge.

For his part, Jackson claims the officers chose to summarily end the dispute over whether plaintiff was going to walk down the stairs: "[a]nd then they just basically picked me up by my arms and my legs." Jackson Exam at 61. According to plaintiff, the officers carried him down a total of about six steps to a landing on the stairwell before realizing plaintiff was "pretty upset" and deciding to take off the handcuffs to allow him to navigate the rest of the stairs on his own. Id. Plaintiff asserts he was in handcuffs for a total of "[a]bout three to four minutes, maybe a little bit longer." Id. at 102.

For their part, Pavlot and Monahan deny carrying Jackson down any stairs at all. Pavlot Dep. at 21; Monahan Dep. at 21. Rather, they claim that Herkimer Police Sergeant Long, one of their superiors at the time, "came up the stairs and advised" them that they "could handcuff plaintiff with his hands in front." Pavlot Aff. at ¶ 18. According to Pavlot, plaintiff was then able to walk down the stairs himself. Id. ¶ 19.

This issue aside, the parties agree that Jackson was then instructed to enter the living room on the first floor, where the other occupants of the house had been gathered. Jackson Exam at 62. Plaintiff, now free of the handcuffs, claims he was still "pretty upset" at this time, so the officers "let [him] go back upstairs so [he] would calm down." Id. at 64. Plaintiff went upstairs, poured himself a cup of coffee, and went back downstairs to the living room. Id. The officers then "pretty much took what [evidence] they had" and left. Id. at 65.

After the police left, Jackson went to the emergency room, where his head, arms, and wrists were examined for injuries. Jackson Exam at 67. Plaintiff was prescribed an anti-inflammatory, which he took for a "couple days" before flushing the rest down the toilet. Id. at 68-69. Plaintiff

received x-rays on a follow-up visit and was told that "everything looked okay." Id. at 70. Plaintiff has since followed up with a specialist for injuries to his right shoulder. Id. at 71. As a result of these events, plaintiff claims that he continues to experience pain that significantly limits his range of motion and ability to perform daily activities.

## III. LEGAL STANDARD

**\*4** The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A f act is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jef freys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV. DISCUSSION

### A. Officers' Entry and Jackson's Detention

As an initial matter, Jackson's opposition paperwork, and in particular his Response to defendants' Statement of

Material Facts, attempts to: (1) characterize plaintiff's rental arrangement with the McNair family as creating an entirely "separate residence" within the Church Street home, suggesting any police intrusion into this particular area of the dwelling was impermissible; and (2) establish that police had no evidence implicating him in the criminal activity being investigated in the warrant and therefore lacked authority to detain him for any length of time at all.

But both of these assertions run afoul of binding U.S. Supreme Court precedent. "Police executing a search warrant are privileged to detain individuals, even to the point of handcuffing them, while [a] search is carried out." Bancroft v. City of Mt. Vernon, 672 F. Supp. 2d 391, 403 (S.D.N.Y. 2009); see also Michigan v. Summers, 452 U.S. 692, 705 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.").

As the Supreme Court has since explained, "Summers makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies detention of that occupant.'" Muehler v. Mena, 544 U.S. 93, 99 n.2 (quoting Summers, 542 U.S. at 703-04). [8]

**\*5** In this case, the warrant issued by Judge Crandall authorized a search of the "entire residence" at 514 Church Street, as well as "any persons located therein," for drugs and related evidence. This broad language, which concerned an entire structure and all of its occupants as opposed to an individual room, apartment, or list or suspects, is clearly sufficient to authorize law enforcement's intrusion into all areas of the home as well as the temporary detention of everyone found inside at the time.

Further, even assuming the search warrant simply identified the "entire residence" at Church Street and omitted any specific language regarding the dwelling's occupants, the officers' entry—privileged as it was on the basis of the search warrant for drugs, the validity of which Jackson does not challenge—would also entitle them to temporarily detain anyone found inside the premises, for safety purposes, while conducting the search. See, e.g., Jackson ex rel. Jackson v. Suffolk Cnty., 87 F. Supp. 3d 386, 401 (E.D.N.Y. 2015) ("First, even though [the defendant officer] believed that [plaintiff's mother] was not a suspect, it was not unreasonable,

in the interest of safety, for the officers to detain and handcuff [the minor plaintiff] during the search.").

Given the undisputed circumstances presented here, Jackson cannot seriously claim the officers did not possess the authority to enter a shared, second-floor kitchen inside the Church Street home or the concomitant ability to detain him in some manner during the execution of the valid search warrant. Indeed, plaintiff eventually concedes as much in his opposition memorandum. See Pl.'s Mem. Opp'n Summ. J. at 6 ("Plaintiff does not disagree that [law enforcement] were conducting a lawful search for narcotics and contraband, authorized by Judge Crandall, at the address in which Plaintiff resides."). Accordingly, any claim that detaining plaintiff for any length of time was somehow unreasonable *per se* must be rejected.

### B. Excessive Force / Failure to Intervene

Given this initial conclusion, Jackson's § 1983 claim s still require a determination regarding whether, viewing the record in the light most favorable to plaintiff, a reasonable jury could conclude: (1) Pavlot and / or Monahan carried out their detention and escort of plaintiff in an objectively unreasonable manner; and relatedly, whether (2) one failed to intervene to stop the other from acting unreasonably under the circumstances.

First, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard." Graham v. Connor, 490 U.S. 386, 395 (1989). Under Graham, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

This "reasonableness" test requires a consideration of the totality of the circumstances giving rise to the challenged interaction. Lozada v. Weilminster, 92 F. Supp. 3d 75, 92 (E.D.N.Y. 2015). Simply stated, the "[a]pplication of physical force is 'excessive' when it is more than is necessary in the circumstances." Bancroft, 672 F. Supp. 2d at 405. At the same time, however, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (quoting Graham, 490 U.S. at 396).

**\*6** Jackson asserts in his opposition memorandum that "[e]verything from the unnecessary harsh handcuffing, to the pushing of Plaintiff resulting in him striking his head, to escorting him downstairs while handcuffed behind his back, was excessive." Pl.'s Mem. at 6. But this language requires some careful parsing at the outset, since it actually leaves the remaining scope of plaintiff's § 1983 claims a little unclear.

For instance, assuming Jackson erroneously omitted a comma from this statement, intending to complain about the "unnecessary[,] harsh handcuffing," his challenge could be fairly read as including the assertion that *any* use of handcuffs at all was unreasonable under these circumstances. If, on the other hand, plaintiff erroneously omitted a suffix, intending to complain about the "unnecessar[ily] harsh handcuffing," his challenge is better understood as a claim that begins with the manner in which the handcuffs were applied.

### 1. Decision to Use Handcuffs

Assuming Jackson intended to press the more expansive construction of this phrase, his assertion that the officers' mere use of handcuffs during the detention could be found objectively unreasonable must be rejected.

"Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Mena, 544 U.S. 93. Where, as here, there is a possibility that a search may turn up contraband or even weapons, the U.S. Supreme Court has previously concluded that "the use of handcuffs minimizes the risk of harm to both officers and occupants." Id. at 100. Indeed, the Supreme Court in Mena specifically noted that "the need to detain multiple occupants during the search ma[kes] the use of handcuffs all the more reasonable." Id.

Considering all the undisputed factors present in this case—law enforcement's ongoing attempt to locate and temporarily detain at least "four to five" occupants found on multiple floors of a home during the execution of a valid no-knock warrant for contraband believed to be connected to an individual who may have been in possession of a firearm—no reasonable jury could conclude that the officers' decision to use handcuffs to temporarily detain Jackson for three to four minutes during the search was anything other than objectively reasonable under the circumstances. See, e.g., Jackson ex rel. Jackson, 87 F. Supp. 3d at 401 (finding it objectively reasonable for officers executing a search warrant to detain and handcuff suspects who were not target of investigation during approximately ten-minute search); McKim v. Cnty. of

Jackson v. Village of Ilion, New York, Not Reported in Fed. Supp. (2016)

Case 6:19-cv-00766-GTS-TWD    Document 4    Filed 07/30/19    Page 15 of 41

Rensselaer, 2011 W L 2580327, at *11 (N.D.N.Y. June 28, 2011) (Sharpe, J.) ("[G]iven defendants' belief that narcotic transactions were being conducted in plaintiffs' apartment, the mere facts that plaintiffs were handcuffed and, at times, held at gunpoint, do not alone supply a basis for a claim of excessive force."); Bancroft, 672 F. Supp. 2d at 405 (rejecting claim that officers' decision to use handcuffs on occupants during brief detention could be excessive where use of handcuffs had already been deemed a "privileged action" under the rationale of Mena); Notice v. Koshes, 386 F. Supp. 2d 23, 27 (D. Conn. 2005) (" In this case, where the plaintiffs do not dispute the validity of the warrant and, therefore, the existence of probable cause to search for drugs and weapons at the residence, there is no question that the use of handcuffs does not rise to the level of a constitutional violation.").

### 2. Tight Handcuffing

**\*7**  Second, although Jackson does explicitly attempt to articulate that his excessive force claim is based on any assertion that the handcuffs, once applied, were made excessively tight, it is recognized that many courts in this Circuit have adopted a slightly altered "reasonableness" standard for evaluating such claims. See Smith v. Skardinski, 2013 WL 2427434, at *4 (N.D.N.Y. June 4, 2013) (expressing skepticism regarding this approach in light of Graham's reasonableness standard).

In this inquiry, courts consider evidence that: (1) the handcuffs were made unreasonably tight; (2) the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013). In other words, the hallmarks of this kind of claim are allegations that "a police officer tightened handcuffs to an unreasonable degree, that the plaintiff protested to no avail, and that the plaintiff suffered serious injury as a result." Id. at 594 (denying summary judgment on excessive force in handcuffing claim where plaintiff claimed defendant "maliciously compressed" handcuffs in response to his complaints of tightness).

To the extent Jackson's claim may alternatively be construed as one based on such a theory, it must also fail. According to plaintiff, he told the officers they were hurting him while they pulled his left arm back to handcuff him. Plaintiff further claims that the officer wrenched this left arm and were "really clenching up on [his hands] pretty hard" during this handcuffing process.

But Jackson's own narrative fails to include any indication that he ever felt that the handcuffs, once applied, were too tight during the approximately "three to four" minutes he claims were on his wrists. See Smith v. City of New York, 2010 WL 3397683, at *11 (S.D.N.Y. Aug. 27, 2010) ("A handcuffing cannot be expected to be comfortable, and there is nothing in plaintiff's testimony to suggest that this handcuffing was unreasonably tight.").

Nor is there any indication in the record that Jackson communicated such a feeling to the officers, or that he did and such a plea was ignored, or that he requested any medical attention during or immediately after this encounter. See Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 307 (D. Conn. 2009) (granting summary judgment on handcuffing claim where plaintiff's testimony established that he did not complain to officers of any injuries, request any medical attention, or even inform defendant officers that the handcuffs had been applied too tightly).

Rather, Jackson's narrative only indicates that his initial request to be handcuffed in front was denied, the officers were rough and forceful with him after helping him to his feet, and that, following the dispute in the stairwell, the officers eventually released him so that he could make his way to the living room on his own. Those claims, and plaintiff's claims of significant injury resulting from his encounter, will be addressed below. But viewing all the facts regarding the handcuffs themselves in the light most favorable to plaintiff, any unarticulated claim based on "tight handcuffing" must be dismissed.

### 3. Officers' Conduct

What remains is an analysis of whether a reasonable jury could find that one or more aspects of either officer's conduct—wrenching Jackson's left arm behind him during the handcuffing, being rough and forceful while helping him stand up, causing him to bump his head while pulling up his pants, or carrying him down to the first landing of the stairs following his verbal refusal to cooperate—considered individually or in the aggregate, was objectively unreasonable under the circumstances.

**\*8**  To review, Jackson's narrative is as follows: several officers entered the second-floor kitchen, told him to get down on the floor, and ran to the third-floor attic area, presumably to check that space for occupants. When the officers returned to the kitchen, defendants forcefully handcuffed him behind

his back when he indicated he could not put his hands behind him. [9] The officers wrenched plaintiff's left arm in this process. [10]

Pavlot, along with Monahan, then "helped" Jackson to a standing position. Defendants assert, and plaintiff does not deny, that by this time in the encounter plaintiff's pants had begun falling down. When the officers, who were being rough and forceful, fumbled to pull plaintiff's pants up, plaintiff fell forward and struck his head on the microwave.

The officers then attempted to escort Jackson to the first-floor living room via the stairwell. Plaintiff argued with the officers for a few seconds before they decided to carry him down to the first landing, but then released him to walk the rest of the way down the stairs himself.

Jackson contends that this entire course of conduct was completely unnecessary because defendants were already in "complete command of the situation" by the time the challenged events occurred. But although plaintiff believes defendants should have been more solicitous of his requests to be handcuffed in front or perhaps less forceful in responding to his refusal to walk down the stairs, the appropriate question is whether a reasonable jury could find the officers' challenged conduct to be objectively unreasonable under the circumstances, not whether a plaintiff can identify "some less intrusive alternative [that] would have done the job." Bancroft, 672 F. Supp. 2d at 406.

Instead, Jackson's own narrative underscores that the entire episode—from the time he was first handcuffed to the moment he was released—occurred while the police were in the process of securing the premises and gathering its occupants, including plaintiff, in the first-floor living room area. Indeed, crediting plaintiff's version of events, and drawing all reasonable inferences from that narrative in his favor, there is no indication that def endants applied anything approaching an objectively unreasonable, let alone a gratuitous, amount of force either during the initial handcuffing or at any time during the approximately "three to four" minutes plaintiff remained handcuffed. See Ferraresso, 646 F. Supp. 2d at 308 (" There is no proof here that [the officer], by twisting [plaintiff's] left arm and placing it behind his back, used force that would constitute a constitutional violation."); Bancroft, 672 F. Supp. 2d at 406 (declining to find any constitutional violation from plaintiff's allegations of officers' forceful behavior, including a "single push," during the time he was handcuffed).

To be sure, Jackson was an innocent tenant who claims to have sustained a significant injury during the lawful execution of a search warrant for drugs. [11] But "reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury." Ferraresso, 646 F. Supp. 2d at 308 (citations omitted). Viewing all the facts in the light most favorable to plaintiff, the non-movant here, no reasonable juror could conclude that either officer's conduct violated plaintiff's federal constitutional rights. Accordingly, plaintiff's § 1983 claim for excessive force and failure to intervene will be dismissed.

### C. Municipal Liability

**\*9** Jackson has also named the Village as a defendant to this action. However, plaintiff's opposition memorandum indicates that "no Monell claim was intended to be filed herein." Pl.'s Mem. at 16. In any event, since there was no violation of plaintiff's federal constitutional rights, the Village has no liability under Monell. See, e.g., Lynch ex rel. Lynch, 567 F. Supp. 2d at 469. Accordingly, plaintiff's § 1983 claims against the Village will be dismissed.

### D. State Law Claims

As just discussed, all of Jackson's federal § 1983 claims will be dismissed. When a plaintiff's federal claims are dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances. Genovese v. Town of Southampton, 921 F. Supp. 2d 8, 26 (E.D.N.Y. 2013) (collecting cases). There are no exceptional circumstances present in this case that might warrant a different conclusion. Accordingly, supplemental jurisdictional over plaintiff's state law claims will be declined. 28 U.S.C. § 1367(c)(3).

### V. CONCLUSION

Defendants' motion for summary judgment will be granted in part and denied in part. Jackson's § 1983 claims for excessive force against Pavlot and Monahan will be dismissed. Given this conclusion, plaintiff's § 1983 claims asserting a failure to intervene to prevent the use of such force must be dismissed. Since there has been no underlying federal constitutional violation, plaintiff's Monell claim against the Village must also be dismissed. Finally, as the only federal claims have been dismissed, supplemental jurisdiction over plaintiff's state law claims will be declined.

Jackson v. Village of Ilion, New York, Not Reported in Fed. Supp. (2016)

Case 6:19-cv-00766-GTS-TWD    Document 4    Filed 07/30/19    Page 17 of 41

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2. Plaintiff's § 1983 claims for excessive force and failure to intervene are DISMISSED;

3. Plaintiff's § 1983 claim for municipal liability is DISMISSED; and

4. Jurisdiction over plaintiff's state law claims is DECLINED and those claims are DISMISSED without prejudice.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 126392

Footnotes

1    The background on summary judgment is ordinarily drawn from a careful review of a movant's Statement of Material Facts and a non-movant's response to same, since a comparison of these documents typically serves to chronicle the relevant events as well as highlight pertinent factual disputes in the parties' competing narratives. However, Jackson's responsive submission is not particularly helpful in achieving this goal, for reasons that will be discussed below. Nor has plaintiff submitted his own affidavit in opposition, which might have distilled his earlier descriptions of events into a clear narrative for purposes of this motion.

Therefore, the background recounted here has been culled from an independent review of all the submissions in this case, the primary one being a transcript of plaintiff's 50-h examination, which was submitted in its entirety as part of plaintiff's opposition paperwork. See Jackson 50-h examination ("Jackson Exam"). Finally, although defendants' respective versions of events almost completely align with plaintiff's narrative, the few relevant additional details and minor factual disputes have been carefully noted.

2    Several of the McNair relatives who were also living on the second and third floors are present for these events, but none become involved with Jackson's story and therefore references to them have been omitted for narrative clarity.

3    Officer Pavlot claims that Jackson initially resisted the attempt to place his hands behind his back, but eventually complied. Pavlot Dep. at 12-13.

4    Officer Monahan claims he arrived in the kitchen in time to help Jackson to his feet. Monahan Dep. at 10-11.

5    Plaintiff claims one of the officers exclaimed "Oh, shit" when this happened. Jackson Exam at 50.

6    Officer Pavlot clarified that he felt, more than saw, this happen, because he was looking down at plaintiff's pants at the time. Pavlot Dep. at 20-21.

7    Jackson acknowledges wearing "jeans and a t-shirt" that morning. Jackson Exam at 35.

8    The U.S. Supreme Court has recently determined that this authority is not completely unlimited. See Bailey v. United States, 133 S. Ct. 1031, 1043 (2013) ("A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant."). But Jackson readily concedes he was detained while present inside the Church Street home, so the circumstances contemplated by Bailey are not presented here.

9    Jackson specifically claims that his disability affects only his *lower* limbs.

10   Plaintiff alleges injury to his *right* shoulder.

11   A careful reading of the submissions raise serious questions about whether or not plaintiff actually sustained any significant or serious injuries.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Merrill v. Schell, W.D.N.Y., August 30, 2017

2015 WL 5730605
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard Holt DUNKELBERGER
and Sarah Allen, Plaintiffs,
v.
Richard Henry DUNKELBERGER, Merilyn
Gale Dunkelberger, William Willard
Dunkelberger, Benjamin Dunkelberger, Scott
Reilly, Joseph Izzo, Ryan Delaney, Come N.
Ketchakeu, Anthony Gentile, Craig, Siegal,
John Fitzgerald and John Doe, Defendants.

No. 14–CV–3877 (KMK).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Anthony M. Giordano, Esq., Giordano Law Office, Ossining, NY, for Plaintiffs.

Jonathan Matthew Victor, Esq., Law Office of Jonathan Victor PLLC, Mahopac, NY, for Defendants Richard Henry Dunkelberger, Merilyn Gale Dunkelberger, William Willard Dunkelberger, and Benjamin Dunkelberger.

Inna Ringh, Esq., Adam Joseph Sansolo, Esq., Attorney General of the State of New York, New York, NY, for Defendants Scott Reilly, Joseph Izzo, Ryan Delaney, Come N. Ketchakeu, and Anthony Gentile.

Eric Daniel Feldman, Esq., Law Firm of Louis Ginsberg, P.C., New York, NY, for Defendants Craig Siegal and John Fitzgerald.

*OPINION & ORDER*

KENNETH M. KARAS, District Judge.

***1** Plaintiffs Sarah Allen ("Sarah") and Richard Holt Dunkelberger ("Richard") bring claims against Richard Henry Dunkelberger ("Dunkelberger"), Merilyn Gale Dunkelberger ("Gayle"), William Willard Dunkelberger

("William"), and Benjamin Dunkelberger ("Benjamin") (collectively the "Dunkelberger Defendants"); Scott Reilly ("Reilly"), Joseph Izzo ("Izzo"), Ryan Delaney ("Delaney"), Come N. Ketchakeu ("Ketchakeu"), and Anthony Gentile ("Gentile") (collectively the "State Trooper Defendants"); and Craig Siegal ("Siegal") and John Fitzgerald ("Fitzgerald") (collectively the "Somers Police Defendants"), alleging that Defendants violated their constitutional rights and committed state torts.[1] The Dunkelberger Defendants, the State Trooper Defendants, and the Somers Police Defendants move to dismiss all claims asserted against them. For the following reasons, each Motion is granted in part and denied in part.

*I. Background*

*A. Factual Background*

The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for the purpose of these Motions To Dismiss.[2] Richard is the son of Dunkelberger and Dunkelberger's former wife, Gayle. (Second Am. Compl. ¶¶ 8–9 (Dkt. No. 16).) William and Benjamin are Richard's brothers. (*Id* . ¶¶ 10–11.) Sarah is Richard's girlfriend. (*Id.* ¶ 123.) Reilly, Izzo, Delaney, Ketchakeu, and Gentile were New York State Troopers stationed at the Somers trooper barracks, (*id.* ¶¶ 12–16); John Doe represents unknown members of the New York State police believed to be stationed in Somers, (*id.* ¶ 19); and Siegal and Fitzgerald were Somers Police Department Officers, (*id.* ¶¶ 17–18).

On March 15, 2012, and at all relevant times, Dunkelberger resided in a separate apartment in the home of Richard and Sarah at 210 Rte. 100 in Somers. (*Id.* ¶ 20.) Richard and Dunkelberger had been in an ownership dispute over that property. (*Id.* ¶ 21.) Plaintiffs allege that Richard owned the property, but years earlier had transferred the title to Dunkelberger without a written agreement or consideration so Dunkelberger could obtain a mortgage to pay off debt, with the understanding that Dunkelberger would pay the mortgage, obtain life insurance to pay the debt in the event of his death, and eventually return title to Richard. (*See id.* ¶ 22.) According to Richard, however, once he transferred the title to Dunkelberger, Dunkelberger obtained a mortgage but did not make any payments or obtain life insurance, and refused to return the title to Richard. (*Id.* ¶ 23.) Richard made payments on the mortgage until 2012, at which point he refused to make further payments and demanded that his father either make

the future payments or return the title to him. (*Id.* ¶ 24.) This caused the Dunkelberger Defendants to become angry with Richard. (*Id.* ¶ 25.)

According to Plaintiffs, the Dunkelberger Defendants decided that they would try to have Richard arrested and removed from the property, and then rent the apartment and use the rental income to pay Dunkelberger's mortgage. (*Id.* ¶ 26.) Plaintiffs further allege that the Dunkelberger Defendants agreed that Gayle would file a false police report alleging that Richard threatened to harm himself and had weapons in the house, and "in furtherance of their conspiracy" to remove Richard, Gayle called the state police in Somers on March 15, 2012 and "reported this false claim." (*Id.* ¶¶ 27–28.) Plaintiffs allege, upon information and belief, that Gayle was "advised that the troopers would want to enter the home to search and remove the weapons in there but that they could not enter without a warrant unless an emergency existed," and that if Richard "threatened someone at the house, police could use such a threat to search the house for the person threatened and remove both the weapons" and Richard. (*Id.* ¶ 29.) Plaintiffs allege, upon information and belief that "at the direction of the State Police," Gayle had Dunkelberger picked up at his apartment and driven to Gayle's home, then reported to the police that Dunkelberger might be in danger. (*Id.* ¶ 30.) Plaintiffs allege, upon information and belief, that the "police did not ask Gayle for the source of her information regarding Richard's alleged suicide or her belief that Dunkelberger might be in danger." (*Id.* ¶ 31 (internal quotation marks omitted).) On March 15, 2012, before the police arrived, Dunkelberger left his apartment, entered a vehicle operated by one of the Dunkelberger Defendants, and drove to Gayle's home. (*Id.* ¶ 32.) Plaintiffs allege that all Defendants knew that Dunkelberger was not at the residence. (*Id.* ¶ 112.)

**\*2** At approximately 6:20 PM on March 15, 2012, Richard and Sarah were at their home when Richard saw a police vehicle in the driveway, and he exited the home and walked to the edge of the fence to ask why they were there. (*Id.* ¶¶ 33–34.) Delaney, standing behind a police vehicle, yelled into a microphone, asking if anyone else was in the house. (*Id.* ¶ 36.) Plaintiff said yes and, without warning, cause, or justification, a trooper standing next to Delaney pointed a shotgun at Richard's head and ordered him not to move. (*Id.* ¶ 37.) At the same time, another trooper raised a semi-automatic revolver at Richard. (*Id.* ¶ 38.) With two weapons pointed at him, Richard heard a shotgun rack behind him and assumed it was pointed at him. (*Id.* ¶ 39.) At this time, Delaney demanded

Richard provide his name and age. (*Id.* ¶ 42.) Richard gave his name and began reaching for his wallet for identification, and a state trooper holding a semiautomatic pistol raised it toward Richard's head and told him not to reach. (*Id.* ¶ 43.) Richard was handcuffed from behind and forced to lie down on a concrete walk. (*Id.* ¶ 44.) Delaney demanded that Richard disclose where he kept his guns, and struck him in the back with a fist or foot, causing him pain and to lose his breath. (*Id.* ¶ 45.)

Two troopers picked Richard up off the ground and began a search of his person. (*Id.* ¶ 46.) No one informed Richard why they were there or why he was detained. (*Id.* ¶ 47.) Although Richard's hands were handcuffed behind his back, a state trooper continuously aimed a weapon at Richard. (*Id.* ¶ 48.) During the search, police found a small pocketknife used by Richard to open his nicotine gum in his wallet. (*Id.* ¶ 49.) A trooper asked Richard why he carried the knife, Richard responded that he used it to open his nicotine gum, and a nearby trooper holding a shotgun raised it toward Richard, racked it, and shouted, "gun." (*Id.* ¶ 50.) Richard was then placed, handcuffed, into the back of a state trooper vehicle. (*Id.* ¶ 51.) At the time, no trooper had asked Richard if he was suicidal or had threatened harm to himself or anyone else. (*Id.*) Richard complained to the troopers that the handcuffs were too tight and were hurting him, but the troopers did not loosen them. (*Id.* ¶ 52.)

Before Richard was placed in the car, two troopers banged on the kitchen door, which was answered by Sarah. (*Id.* ¶¶ 53–55.) The troopers saw Plaintiffs' dog and ordered Sarah to secure it in another room. (*Id.* ¶ 56.) The troopers then entered the house, asking, without providing context, where Dunkelberger was. (*Id.* ¶ 57.) At no time before that did the troopers ask Sarah whether Richard was suicidal or whether Dunkelberger might be in danger. (*Id.* ¶ 58.) Sarah told police she did not know where Dunkelberger was, but assumed he was in his apartment, and the two troopers escorted Sarah upstairs and began a room-to-room search of the home, beginning with Dunkelberger's apartment. (*Id.* ¶ 59.) There was no objective indication that an emergency situation existed, and the troopers ignored the fact that the apartment had a separate outside entrance. (*Id.*) As the troopers searched the home, the Somers Police Defendants arrived and joined the search. (*Id.* ¶ 62.) At various points during the search, all of the Somers Police Defendants and the State Trooper Defendants entered the home. (*See id.* ¶ 63.) At no time during the police action did Richard express suicidal ideations,

appear mentally ill, or act in a manner likely injurious to himself or others. (*Id.* ¶ 64.)

**\*3** Gayle was present and observed the search of Plaintiffs' home from Plaintiffs' driveway, with the consent of the State Trooper Defendants. (*Id.* ¶ 65.) The troopers then sought access to Richard's gun safe to remove the weapons. (*Id.* ¶ 66.) Delaney demanded that Sarah tell him where the gun safe was, and, after having Sarah remove the dog from the bedroom, Delaney entered the bedroom to access the locked and secured gun safe. (*Id.* ¶¶ 67–69.) Delaney demanded Sarah give him the key to the safe, but she did not have it and told him that she did not know where it was kept, at which time Delaney threatened to arrest her for obstructing justice. (*Id.* ¶¶ 70–71.)

At that point, Richard was finally asked by a trooper if he had threatened to harm himself or kill himself, and Richard told him no. (*Id.* ¶¶ 73–74.) Fitzgerald then approached Richard and told him that prescription drugs were found out of their bottles, and that Richard would likely be charged with a felony. (*Id.* ¶ 75.) Delaney then came to the car and demanded that Richard give him the gun safe key. (*Id.* ¶ 76.) Richard denied having the key, and Delaney accused him of lying and threatened to rip the safe off the wall or have a locksmith come to open it. (*Id.* ¶ 77.) Richard declined to provide the key or otherwise respond to interrogation, exercising his Fifth Amendment rights. (*Id.* ¶ 78.) However, Delaney, without having administered *Miranda* warnings, continued to interrogate Richard, and threatened to arrest him if he continued to refuse to disclose the key's whereabouts. (*Id.* ¶ 79.) When Delaney threatened to arrest Sarah, Richard agreed to disclose the key's location to Sarah. (*Id.*) Sarah was then escorted to the patrol car, where she saw at least six officers in the driveway with weapons out, and Richard gave her the combination to a case, inside of which was the gun safe key. (*Id.* ¶¶ 80–81.) Sarah was escorted back to the house, but, when she was unable to immediately open the case due to the trauma caused by the circumstances, Delaney roughly grabbed her arm and threatened to arrest her if she did not open the case "now." (*Id.* ¶ 82.) Once they gained access to the safe, the police began removing the weapons. (*Id.* ¶ 83.) In Sarah's presence, one officer asked Delaney what to do with bb guns in the safe, to which Delaney responded that "all weapons were to be removed as it would 'be a shame to have to come back and kill him [Richard] over bb guns.' " (*Id.* ¶ 84.)

After police removed the weapons, Delaney drove Richard to the hospital for admission under New York's Mental Hygiene Law § 9.41, "notwithstanding the fact that [Richard] exhibited no indicia of mental illness or suicidal ideations or threatening conduct." (*Id.* ¶ 85.) Doctors found Richard competent and not a suicide risk and released him. (*Id.* ¶ 90.) Additionally, Richard was charged with weapons possession for an unregistered handgun, but the charge was dropped by prosecutors due to the allegedly illegal search of his home and gun safe. (*Id.* ¶ 91.) Plaintiffs allege that during the criminal prosecution, state troopers provided false information in an attempt to justify their detention, including that Richard was observed "frothing at the mouth." (*Id.* ¶ 92.)

**\*4** In December 2012, John Doe, an unknown state police officer, released Richard's weapons to the Dunkelberger Defendants without Richard's permission. (*Id.* ¶ 93.) The Dunkelberger Defendants have since refused to return the weapons to Richard, despite Richard having demanded their return and despite Richard being the true owner of the guns. (*Id.*)

Plaintiffs further allege that the search and seizure was done without a warrant and at no time was Richard intoxicated, incapacitated, threatening or disorderly, and had committed no criminal offense and engaged in no criminal behavior in the presence of police or known to police." (*Id.* ¶¶ 94, 97–98.) Plaintiffs further allege that they did not consent to police entering their home. (*Id.* ¶ 101.)

### B. Procedural Background

Plaintiffs filed suit in New York State Supreme Court, County of Westchester on April 18, 2014. (*See* Notice of Removal (Dkt. No. 1).) The Somers Police Defendants removed to federal court on May 30, 2014, (*see id.*), which was consented to by the State Trooper Defendants, (*see* Dkt. No. 5), and by the Dunkelberger Defendants, (*see* Dkt. No. 6). On June 16, 2014, Plaintiffs filed the First Amended Complaint. (Dkt. No. 9.) On September 24, 2014, the Court held a pre-motion conference, and granted Plaintiffs permission to file a Second Amended Complaint and for Defendants to then move to dismiss. (*See* Dkt. (minute entry for Sept. 24, 2014).) Plaintiffs filed the Second Amended Complaint on October 14, 2014. (Dkt. No. 16.)

Pursuant to a schedule set by the Court, (Dkt. (minute entry for Sept. 24, 2014)), and extended on request of the Parties, (Dkt. No. 24), the Parties submitted the following papers: On October 29, 2014, the Dunkelberger Defendants filed their Motion To Dismiss and accompanying papers, (Dkt. No. 17), Plaintiffs filed their opposition on December

29, 2014, (Dkt. No. 26), and the Dunkelberger Defendants replied on January 5, 2015, (Dkt. No. 29). On October 30, 2014, the Somers Police Defendants filed their Motion and accompanying papers, (Dkt.Nos.18–19), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 27), and the Somers Police Defendants replied on January 6, 2015, (Dkt. No. 30). Finally, the State Trooper Defendants filed their Motion and accompanying papers on November 3, 2014, (Dkt.Nos.21–22), Plaintiffs filed their opposition on December 29, 2014, (Dkt. No. 28), and the State Trooper Defendants replied on January 23, 2015, (Dkt. No. 32). On July 31, 2015, the Court issued an Order granting Plaintiffs permission to file a surreply memorandum no later than August 7, 2015, responding to arguments raised for the first time in the State Trooper Defendants' Reply Memorandum, (Dkt. No. 33.), which was timely filed (Dkt. No. 34).

## II. Discussion

### A. Standard of Review

Defendants moves to dismiss Plaintiffs' Second Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alterations, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement ." *Id.* (alterations and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id; see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed.R.Civ.P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*5** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Dixon v. United States,* No. 13–CV–2193, 2014 WL 23427, at *1 (S.D.N.Y. Jan. 2, 2014) ("For the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's] complaint are true."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res ., Inc.,* No. 13–CV–4384, 2014 WL 182341, at *1 n. 1 (S.D.N.Y. Jan.16, 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012)).

### B. Analysis

#### 1. Materials Considered in Deciding this Motion

As noted above, in opposing Defendants' Motions, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint. Furthermore, they attach two documents in their Opposition to the Somers Police Defendants' and the State Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police Field Manual regarding mentally ill persons. (*See* Pls.' Mem. of Law in Opp'n to Somers Defs. S[ie]gal and Fitzgerald's Mot. To Dismiss ("Pls. Somers Police Opp'n") Exs. A, B (Dkt. No. 27); Mem. of Law in Opp'n to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b)(6) of the FRCP ("Pls. State Trooper Opp'n") Exs. A, B (Dkt. No. 28).) "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also Hendrix v. City of New York,* No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec.20, 2013) (same). "To be

incorporated by reference, the complaint must make a clear, definite[,] and substantial reference to the documents[,] and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (brackets and internal quotation marks omitted). When considering whether a plaintiff relies on the document in framing the complaint, it is sufficient if "the complaint relies heavily, albeit implicitly, upon [the document's] terms and effect." *Capela v. J.G. Wentworth, LLC,* No. 09–CV–882, 2009 WL 3128003, at *1 n. 2 (E.D.N.Y. Sept. 24, 2009); *see also Baraliu v. Vinya Capital, L.P.,* No. 07–CV–4626, 2009 WL 959578, at *4 (S.D.N.Y. Mar.31, 2009) (noting that a court may review "any documents that are integral to [the] plaintiff's allegations even if not explicitly incorporated by reference").

**\*6** The Court disregards all factual assertions contained in the summaries of facts in Plaintiffs' opposition papers but not in the Second Amended Complaint. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b).");  *Green v. City of Mount Vernon,* —— F.Supp.3d ——, 2015 WL 1455701, at *10 (S.D.N.Y. Mar.31, 2015) (declining to consider new factual allegations made by plaintiffs in their opposition papers); *Tolliver v. Skinner,* No. 12–CV–971, 2013 WL 658079, *11 (S.D.N.Y. Feb.11, 2013) (same); *McCray v. City of New York,* No. 03–CV–9685, 2007 WL 4352748, at *30 n. 34 (S.D.N.Y. Dec.11, 2007) (same); *GCG Int'l, Inc. v. Eberhardt,* No. 05–CV–2422, 2005 WL 2647942, at *4 (S.D.N.Y. Oct.17, 2005) (same); *Arnold v. Goetz,* 245 F.Supp.2d 527, 539 (S.D.N.Y.2003) (same).[3]  As to the documents attached to Plaintiffs' Opposition to the Somers Police Defendants and the State Trooper Defendants, Plaintiffs offer no basis for the Court to consider them. The Second Amended Complaint refers to the Manual in two paragraphs, (*see* Second Am. Compl. ¶¶ 87, 89), but this is insufficient to incorporate the document by reference. Indeed, "[l]imited quotation does not constitute incorporation by reference," *Looney v. Black,* 702 F.3d 701, 716 n. 2 (2d Cir.2012) (internal quotation marks omitted), and Plaintiffs did not even do that. Furthermore, because there is no reference to the 911 report in the Second Amended Complaint, it is not integral to the Complaint, and this is not the type of document of which the Court may take judicial notice. *See Alvarez v. Cty. of Orange,* —— F.Supp.3d

——, 2015 WL 1332347, at *10–11 (S.D.N.Y. Mar.25, 2015) (declining to take judicial notice of a police incident report).

### 2. Qualified Immunity

"A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (citation and internal quotation marks omitted); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (same). Because qualified immunity is "an affirmative defense [that] ... reflects an immunity from suit rather than a mere defense to liability[,] .... it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman,* No. 12–CV–3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013), *aff'd,* 751 F.3d 78 (2d Cir.2014) (emphasis and internal quotation marks omitted). "In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the standard of qualified immunity as one of 'arguable probable cause.' " *Id.* (footnote omitted) (quoting *Cerrone,* 246 F.3d at 202). "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone,* 246 F.3d at 202–03 (internal quotation marks omitted). In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991); *see also Betts,* 2013 WL 311124, at *4 (same).

### 3. Plaintiffs' Claims against Police Officer Defendants

#### a. State Claims

**\*7** The State Trooper Defendants and the Somers Police Defendants moved to dismiss the state claims asserted against them. (Mem. of Law in Supp. of Defs. Siegal and Fitzgerald's Mot. to Dismiss the Compl. ("Somers Police Defs.' Mem.") 14–15 (Dkt. No. 19); Mem. of Law in Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper

Defs.' Mem.") 15–16 (Dkt. No. 22).) In their Opposition, Plaintiffs conceded that the state law claims should be dismissed. (Pls. Somers Police Opp'n 19; Pls. State Trooper Opp'n 19.) These claims are therefore dismissed. *See Alvarez,* 2015 WL 1332347, at *12 (dismissing claims where the plaintiff conceded he had failed to plausibly plead them and stated that he did not oppose the relief requested by the defendants); *Willner ex rel. Willner v. Doar,* No. 12–CV–1955, 2013 WL 4010205, at *1 (E.D.N.Y. Aug. 5, 2013) (dismissing a claim after the plaintiff made concessions in his opposition brief and consented to the dismissal of his due process claim); *Murphy v. Keller Indus., Inc.,* No. 95–CV–7643, 2002 WL 91622, at *1 (S.D.N.Y. Jan.23, 2002) (granting the defendant's motion to dismiss after the plaintiff, in her opposition papers, "expressly conced[ed] that her claim against the [defendant] [was] barred by the Federal Tort Claims Act").

### b. Fourth Amendment Unreasonable Search Claim

Plaintiffs bring a Fourth Amendment claim against the State Trooper Defendants and the Somers Police Defendants based on the warrantless search of Plaintiffs' home. The Somers Police Defendants and the State Trooper Defendants move to dismiss. (*See* Somers Police Defs.' Mem. 6–11; State Trooper Defs.' Mem. 6–9.) The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *United States v. Bershchansky,* 788 F.3d 102, 110 (2d Cir.2015) (quoting U.S. Const. amend. IV). "Police officers must first obtain a warrant before they search a person's home, unless exigent or other circumstances justify a warrantless search." *Id.; see also Fernandez v. California,* ––– U.S. ––––, ––––, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014) ( "Our cases establish that a warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness. And certain categories of permissible warrantless searches have long been recognized." (citations and internal quotation marks omitted)); *Kentucky v. King,* 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable. But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and internal quotation marks omitted)). Because warrantless searches of the home are presumptively unreasonable, in the absence of

a warrant, police officers need " 'probable cause plus exigent circumstances in order to make a lawful entry into a home.' " *Harris v. O'Hare,* 770 F.3d 224, 231–32 (2d Cir.2014) (quoting *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002)); *see also Soller v. Boudreux,* No. 12–CV–167, 2015 WL 500492, at *11 (E.D.N.Y. Feb.3, 2015) (" '[W]hether the officers had probable cause ..., is the first requirement for a warrantless search on the basis of exigent circumstances.' " (alterations in original) (quoting *Harris,* 770 F.3d at 232)). The Supreme Court has "identified several exigencies that may justify a warrantless search of a home." *King,* 131 S.Ct. at 1856 (discussing the exigencies that may justify a warrantless search). For example, as relevant here, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (internal quotation marks omitted).

**\*8** Here, the State Trooper Defendants argue that the exigent circumstances and emergency aid exceptions apply. (State Trooper Defs.' Mem. 6–9.)[4] In such cases, the relevant question is whether " 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.' " *Jackson v. City of New York,* 29 F.Supp.3d 161, 174 (E.D.N.Y.2014) (alteration in original) (quoting *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)); *see also Harris,* 770 F.3d at 233 ("The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." (internal quotation marks omitted)). Defendants also invoke the emergency aid exception. " 'This ... exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' " *Soller,* 2015 WL 500492, at *12 (some internal quotation marks omitted) (quoting *Michigan v. Fisher,* 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009)). " 'It requires only an objectively reasonable basis for believing ... that a person within the house is in need of immediate aid[,]' i.e., "that medical assistance was needed, or persons were in danger[.]' " *Id.* (citation omitted) (quoting *Fisher,* 558 U.S. at 47). In determining the reasonableness of the officer's belief that exigent circumstances existed, "[c]ourts must apply an objective standard," but nonetheless must apply the "probable cause requirement ... by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning

potentially serious consequences." *Tierney v. Davidson,* 133 F.3d 189, 196–97 (2d Cir.1998) (alteration and internal quotation marks omitted).

According to the facts alleged in the Second Amended Complaint, Gayle called the New York State Police and made a false report that Richard threatened to harm himself and had weapons in the house. (Second Am. Compl. ¶¶ 27–28.) Allegedly, on the direction of the state police, Gayle had Dunkelberger picked up at his apartment and taken to Gayle's house. (*Id.* ¶¶ 30, 32.) Further, Gayle reported to the State Police that Dunkelberger "might be in danger." (*Id.* ¶ 30 (internal quotation marks omitted).) When the State Trooper Defendants arrived and asked Richard if anyone else was in the house, he responded, "yes." (*Id.* ¶¶ 36–37.) Sarah further told the State Trooper Defendants that she did not know Dunkelberger's whereabouts, but assumed he was in his apartment. (*Id.* ¶ 59.) However, Plaintiffs also allege that the State Trooper Defendants and the Somers Police Defendants *knew* Dunkelberger was not at the residence. (*Id.* ¶ 112.) Plaintiffs further emphasize that, other than the phone call from Gayle, there was no indication that Richard was mentally unstable or that there was any emergency situation. (*See, e.g., id.* ¶¶ 59, 64, 66, 90.)

**\*9** Information "provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994). "Significantly, when information furnished by a single complainant suffices to establish probable cause, such information often comes from the victim, who has provided specific details of the crime." *Id.; see also Morrison v. Brooks,* No. 13–CV–4216, 2015 WL 1276768, at \*5 (E.D.N.Y. Mar.13, 2015) ("Information indicating guilt of any crime furnished to police by the victim of a crime generally suffices to establish probable cause, where it seems reasonable to believe that the victim is telling the truth." (alteration, citations, and internal quotation marks omitted)). Courts have also held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth. *See, e.g., Bailey v. City of New York,* 79 F.Supp.3d 424, 444 (E.D.N.Y .2015) ("Law enforcement officials have probable cause to arrest if they receive credible information from putative victims or eyewitnesses. A court will consider the reliability of the identification, including the corroborating circumstances and whether there was reason to question the veracity of the witness." (citations omitted)); *Vanderwoude v. City of New York,* No. 12–

CV–9046, 2014 WL 2592457, at \*15 (S.D.N.Y. June 10, 2014) ("[I]dentification of an individual as a perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." (internal quotation marks omitted)), *reconsideration denied,* 2014 WL 5139341 (S.D.N.Y. Sept.30, 2014); *United States v. McManus,* No. 12–CR–356, 2012 WL 3526669, at \*2 (S.D.N.Y. Aug. 10, 2012) (holding that an identification from "a disinterested eyewitness to one of the robberies ... alone justified [the] arrest").

Here, under the facts alleged in the Complaint, the tip from Gayle was not anonymous, which points toward the existence of probable cause. *Compare Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir.2001) (holding that an anonymous 911 call "could not, by itself, justify the warrantless entry" into a home), *with Sha v. N.Y.C. Police Dep't Twentieth Precinct, Detectives, Officers Doe,* No. 03–CV–5273, 2005 WL 877852, at \*5 (S.D.N.Y. Apr.18, 2005) (noting, in holding that there was probable cause for a warrantless entry, that "[t]he fact that [the complainant] was not an anonymous caller is a crucial point"). Additionally, the Second Circuit has recognized that even "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *United States v. Simmons,* 560 F.3d 98, 105 (2d Cir.2009). "This approach recognizes the need for police to act on reports of an emergency situation without delay, but still requires police officers to corroborate allegations of criminal activity in some meaningful way." *Id.* (citation omitted).

**\*10** However, even assuming that Defendants would have been justified in conducting a warrantless search of Plaintiffs' home based on Gayle's tip on its own, or that they would have been entitled to qualified immunity for the same, Plaintiffs have alleged enough facts to plausibly claim that the search was still unreasonable. According to Plaintiffs' allegations, at the time the warrantless search began, Richard, who had come out of the house, was identified and handcuffed by the State Trooper Defendants. (*See* Second Am. Compl. ¶¶ 34, 43–44.) Furthermore, according to Plaintiffs, before entering the home, Sarah had also come to the front door. (*Id.* ¶ 54.) These allegations are most similar to the facts in *United States v. Simmons,* 661 F.3d 151 (2d Cir.2011). In that case, officers entered the suspect's home, "removed him from his bedroom, placed him against the wall in the common hallway, and made

sure that he had nothing in his possession that could harm them ." *Id.* at 157. He was cooperative and non-combative. *Id.* In deciding that the subsequent warrantless search was unreasonable, the Second Circuit emphasized that "before conducting the search, the officers had effectively allayed the safety concerns that justified their initial questioning of [the suspect] and had, by exercising control over a compliant occupant and the surrounding premises, neutralized any threat that [the suspect] or the gun may have initially posed." *Id.* at 158. "Under these circumstances," the Second Circuit held, "there was simply no 'urgent need' to further search the home for the gun without a warrant." *Id.* Furthermore, based on the facts alleged in the Second Amended Complaint, the officers knew that Dunkelberger was not present in the home, and therefore there was no reason to believe "that a person within the house [was] in need of immediate aid," *Soller,* 2015 WL 500492, at *12, and, given that Richard was restrained outside of the house, there was no need whatsoever to enter the home to recover the weapons at that time without a warrant, *see Simmons,* 661 F.3d at 158–59 (rejecting the argument that another person could have been in the home that either was in danger or posed a threat because there was no reason to believe anyone other than the suspect was in the home); *cf. Schoolcraft v. City of New York,* ––– F.Supp.3d ––––, 2015 WL 2070187, at *32 (S.D.N.Y. May 5, 2015) (holding that because "the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance," even if the initial warrantless entry is justified, the decision to remain is also evaluated on a reasonableness standard), *reconsideration granted on other grounds,* 2015 WL 5542770 (S.D.N.Y. Sept.18, 2015). Thus, even if Defendants would have been entitled to do a warrantless entry and search of Plaintiffs' home based on Gayle's phone call, or even if they were entitled to qualified immunity on that ground, the search still would not have been justified because any threat Richard posed was neutralized before the search started since he was outside the home, handcuffed, and searched, and, under the facts alleged in the Second Amended Complaint, there was no reason to think that Dunkelberger or any other person was in danger inside the home. Based on the facts alleged, no reasonable officer could think otherwise. Therefore, Defendants' Motion To Dismiss this claim is denied.[5]

### c. False Arrest Claim

**\*11** Defendants also move to dismiss Plaintiffs' false arrest claim, arguing that they had probable cause to arrest Richard

based on the New York Mental Hygiene Law ("MHL"). (*See* State Trooper Defs.' Mem. 9–11.)[6] A " § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006); *see also Widget v. Town of Poughkeepsie,* No. 12–CV–3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same). "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly,* 439 F.3d at 151 (internal quotation marks omitted); *see also Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir.2012) ("A § 1983 claim for false arrest ... is substantially the same as a claim for false arrest under New York law." (internal quotation marks omitted)).[7] Under New York Law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.' " *Ackerson,* 702 F.3d at 19 (quoting *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y.1975)).

The State Trooper Defendants and the Somers Police Defendants do not contest that the first three elements are met, but rather argue that the arrest was privileged because there was probable cause to arrest. (*See* State Trooper Defs.' Mem. 9–11; Somers Police Defs .' Mem. 5–6.) "Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson,* 702 F.3d at 19 (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)); *see also Conte v. Cty. of Nassau,* No. 06–CV–4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). Requirements for arrests pursuant to the New York Mental Hygiene Law are interpreted "consistently with the requirements of the Fourth Amendment." *Kerman,* 261 F.3d at 240 n. 8. The State Trooper Defendants argue that there was probable cause to arrest based on the New York Mental Hygiene Law. Specifically, New York Mental Hygiene Law § 9.41 provides that

> [a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any

person who appears to be mentally ill
and is conducting himself or herself in
a manner which is likely to result in
serious harm to the person or others.
Such officer may direct the removal of
such person or remove him or her to
any hospital specified in subdivision
(a) of section 9.39....

"[L]ikely to result in serious harm" is defined as:

**\*12** (a) a substantial risk of physical
harm to the person as manifested
by threats of or attempts at suicide
or serious bodily harm or other
conduct demonstrating that the person
is dangerous to himself or herself,
or (b) a substantial risk of physical
harm to other persons as manifested by
homicidal or other violent behavior by
which others are placed in reasonable
fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01. Thus, Defendants' arrest
of Richard was privileged if "they had probable cause to
conclude that [he] was acting in a manner that invoked
Section 9.41." *Amato v. Hartnett,* 936 F.Supp.2d 416, 435
(S.D.N.Y.2013); *see also Tsesarskaya v. City of New York,*
843 F.Supp.2d 446, 456 (S.D.N.Y.2012) ("[The][d]efendants'
conduct is privileged where there was probable cause to
believe that the individual was a danger to herself or others.");
*Glowczenski v. Taser Int'l Inc.,* No. 04–CV–4052, 2010 WL
1936200, at \*6 (E.D.N.Y. May 13, 2010) ("[B]efore a person
can be seized and detained for psychiatric evaluation, an
official must have probable cause to believe that the person is
dangerous to himself or others.").

"An objective reasonableness standard is applied to police
behavior under Section 9.41, as well as to claims under
the Fourth Amendment," and the question thus becomes "
'whether the facts and circumstances known to the officers
at the time they seized Plaintiff were sufficient to warrant a
person of reasonable caution to believe that [he] might be
mentally ill and conducting [himself] in a manner likely to
result in serious harm to [himself].' " *Amato,* 936 F.Supp.2d
at 435 (alterations in original) (quoting *Nicholas v. City of*

*Binghamton,* No. 10–CV–1565, 2012 WL 3261409, at \*5
(N.D.N.Y. Aug.8, 2012)); *see also Burdick v. Johnson,* No.
06–CV–1465, 2009 WL 1707475, at \*6 (N.D.N.Y. June 17,
2009) (same). "Whether a person seized pursuant to the
MHL is later found to be mentally competent and released
is irrelevant to the probable cause analysis." *Burdick,* 2009
WL 1707475, at \*6; *see also Bayne v. Provost,* No. 04–
CV–44, 2005 WL 1871182, at \*7 (N.D.N.Y. Aug. 4, 2005)
("Like in the criminal context, a police officer is justified
in relying upon a citizen's warning that another person has
threatened suicide even if it is later determined by mental
health professionals that the person presents no such risk .");
*Sanchez v. Town of Greece,* No. 98–CV–6433, 2004 WL
1964505, at \*4 (W.D.N.Y. Sept.1, 2004) ("A mental hygiene
arrest can be based on probable cause even though it is later
determined that the arrested person does not suffer from a
dangerous mental condition."); *Vallen v. Connelly,* No. 99–
CV–9947, 2004 WL 555698, at \*8 (S.D.N.Y. Mar.19, 2004)
("Just as actual innocence will not render an arrest invalid if it
is based on then-existing probable cause that criminal activity
is occurring, a mental health seizure can rest upon probable
cause even when the person seized does not actually suffer
from a dangerous mental condition." (citation omitted)), *aff'd,*
185 F. App'x 22 (2d Cir.2006).

**\*13** Defendants rely on the phone call from Gayle, in which
she stated that Richard threatened to harm himself, that he
had guns in the house, and that Dunkelberger might be in
danger. (Second Am. Compl. ¶¶ 27–28, 30.) Again, there
is no indication that Gayle was a witness or that she told
Defendants the basis for her knowledge, and Plaintiffs allege,
upon information and belief, that the "police did not ask
Gayle for the source of her information regarding Richard's
alleged suicide or her belief that Dunkelberger might be in
danger." (*Id.* ¶ 31 (internal quotation marks omitted).) Once
Defendants arrived, Richard exhibited no behavior indicating
that he might be a risk to himself or others. (*See, e.g., id.* ¶¶
59, 64, 66, 90.) Additionally, as discussed above, Plaintiffs
allege that Defendants knew that Dunkelberger was not in the
home. (*Id.* ¶ 112.)

It is a close call whether Defendants would generally be
entitled to rely exclusively on the phone call from Gayle to
establish probable cause. Defendants had more information
than cases where courts have held there was insufficient
probable cause. For example, in *Kerman,* the officers made
a warrantless entry into the plaintiff's home and detained
him based solely on an anonymous and uncorroborated 911
call. 261 F.3d at 237–38. There, the Second Circuit held that

there was insufficient probable cause but nonetheless upheld the district court's grant of summary judgment on the false arrest claim on the basis of qualified immunity. *Id.* Here, by contrast, the phone call was not anonymous. But Defendants also had less information than cases where courts have held there was sufficient probable cause to arrest. For example, in *Bayne v. Provost,* No. 04–CV–44, 2005 WL 1871182 (N.D.N.Y. Aug. 4, 2005), a licensed nurse who was employed by the plaintiff to aid him in his daily activities "called the 911 emergency number after having a telephone conversation with [the][p]laintiff," "informed the 911 operator that she was a nurse, that [the][p]laintiff was her patient, and that [the][p]laintiff had told her during a telephone call that he planned to commit suicide," and indicated that one possible method of suicide might be an overdose of pills, and, upon arriving, the troopers "observed multiple bottles of pills about the residence." *Id.* at *1–2. There, unlike in this case, the tipper provided the basis for her knowledge, and at least one aspect of her story was corroborated before the arrest. In other cases, such as *Mittelman v. County of Rockland,* No. 07–CV–6382, 2013 WL 1248623 (S.D.N.Y. Mar. 26, 2013), the tipper was an eyewitness and the victim of the alleged threats. *See id.* at *12 ("[The officer] was informed by [the complainant] directly that [the plaintiff] threatened to shoot him. That alone provided probable cause to arrest him .... " (citation omitted)). Finally, in *Glowczenski v. Taser International Inc.,* No. 04–CV–4052, 2010 WL 1936020 (E.D.N.Y. May 13, 2010), a mother called the police reporting that her son was "having a psychotic episode, and was hearing voices." *Id.* at *2 (internal quotation marks omitted). The court held that the mother's 911 calls, combined with the fact that the officers had knowledge of the son's history of mental illness and the fact that the family expressed fear that he might be a danger to himself was sufficient for a finding that probable cause existed. *Id.* at *6.

**\*14** Although Defendants may have been entitled to rely on the call from Gayle, or at least may have been entitled to qualified immunity on this ground, in the absence of other allegations, here Defendants had reasons to doubt the veracity of Gayle's statements. In particular, as discussed below, Plaintiffs allege that the police Defendants and the Dunkelberger Defendants, including Gayle, entered into a conspiracy to deprive Ricard of his constitutional rights. Specifically, although Gayle told the police that Dunkelberger might be in danger, Plaintiffs allege that the police Defendants knew that Dunkelberger was not at home. (Am.Compl.¶ 112.) Thus, there were reasons for Defendants to doubt the veracity of Gayle's statement, and, taking Plaintiffs' allegations as true, it was unreasonable for them to rely on that statement alone,

especially in the absence of any corroborating information, to think they had probable cause to arrest. *See Williams v. City of New York,* No. 14–CV–5123, 2015 WL 4461716, at *4 (S.D.N.Y. July 21, 2015) ("A police officer may have probable cause to arrest and charge a suspect based on information provided by a single victim or witness, 'unless circumstances raise doubts as to the person's veracity.' " (quoting *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001))). [8] Therefore, the Court denies the State Trooper Defendants' and the Somers Police Defendants' Motions To Dismiss the False Arrest claim. [9]

### d. Excessive Force Claim

Defendants next move to dismiss Plaintiffs' Fourth Amendment excessive force claim. (*See* Somers Police Defs.' Mem. 12–14; State Trooper Defs.' Mem. 18–19.) "Application of physical force is excessive when it is more than is necessary under the circumstances." *Brown v. City of New York,* No. 11–CV–1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013). Qualified immunity may also be a defense to an excessive force claim. In this context, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Usavage v. Port Auth. of N.Y. & N.J.,* 932 F.Supp.2d 575, 594 (S.D.N.Y.2013) (internal quotation marks omitted). Plaintiffs allege four categories of conduct by Defendants that could arguably constitute excessive force: (1) excessively tight handcuffing of Richard; (2) threatening Richard and Sarah with arrest and destruction of property; (3) pointing their guns at Richard; and (4) physical force in grabbing Sarah's arm and kicking or punching Richard while he was lying, handcuffed on the ground. The Court will address each type of conduct in turn.

### i. Handcuffing

The Court will first address whether Plaintiffs have stated an excessive force claim based on the handcuffing of Richard. "Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell,* No. 10–CV–1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). This particularized standard reflects the need to balance the "right to use some degree of coercion," including the use of tight handcuffs "to prevent the arrestee's hands from slipping out," *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005) (internal citation omitted), with the use of "overly tight handcuffing" that could constitute

excessive force, *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008). When considering whether handcuffing constitutes excessive force, a court "is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Usavage,* 932 F.Supp.2d at 592 (internal quotation marks omitted); *see also Pelayo v. Port Auth.,* 893 F.Supp.2d 632, 642 (S.D.N.Y.2012) (same). Additionally, "there is a consensus among courts in [the Second Circuit] that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Usavage,* 932 F.Supp.2d at 592 (brackets and internal quotation marks omitted). "These injuries need not be severe or permanent, but must be more than merely de minimis." *Id.* (citation and internal quotation marks omitted). Here, although Plaintiffs plead that Richard complained to the troopers that the handcuffs were too tight and were hurting him, and that the troopers did not loosen them, (Second Am. Compl. ¶ 52), there is no allegation that Richard suffered any injury as a result. Therefore, Plaintiffs fail to state a claim for excessive force based on the handcuffing of Richard. *See, e.g., Selvaggio v. Patterson,* ––– F.Supp.3d ––––, 2015 WL 1293007, at *13 (E.D.N.Y. Mar.20, 2015) (granting summary judgment on excessive force claim where the evidence showed only minimal injuries such as scabbing and abrasions); *Green,* 2015 WL 1455701, at *20 (dismissing excessive force handcuffing claim, in part because the plaintiff failed to allege that she suffered an injury as a result of the handcuffing); *Lozada v. City of New York,* No. 12–CV–38, 2013 WL 3934998, at *5 (E.D.N.Y. July 29, 2013) (granting motion to dismiss excessive force claim because the plaintiff's "vague reference to injuries" and a "complaint of a swelled wrist [were] insufficient" (internal quotation marks omitted)).

#### ii. Threats of Arrest and Destruction of Property

**\*15** Plaintiffs allege that Delaney threatened Sarah with arrest, (Second Am. Compl. ¶¶ 71, 79), and threatened that he would rip the gun safe off the wall or get a locksmith to open the safe if Plaintiffs did not cooperate, (*id.* ¶ 77). "A threat of force does not constitute excessive force." *Mittelman,* 2013 WL 1248623, at *13; *see also Smith v. City of New York,* No. 14–CV–5934, 2015 WL 3929621, at *3 n. 3 (S.D.N.Y. June 17, 2015) ("To the extent that [the plaintiff] intends to assert an excessive force claim based on threats of violence in his affidavit, the claim would fail because, in [the Second] Circuit, neither mere verbal abuse nor mere threats of force support an excessive force claim."); *Pelt v. City of New*

*York,* No. 11–CV–5633, 2013 WL 4647500, at *13 (E.D.N.Y. Aug. 28, 2013) ("Because [the] [p]laintiff alleges nothing beyond mere threats of force, [his] excessive force claim fails."). Moreover, even if there are circumstances under which threats could be sufficient to exercise force, a threat of arrest is not such a situation, *see Robertson v. Town of Washington,* No. 13–CV–3020, 2015 WL 1584888, at *11 (W.D.La. Apr.6, 2015) (holding that the plaintiff did not state a claim for excessive force based on, inter alia, a threat to arrest); *Wilson v. Fla. Dep't of Revenue,* No. 14–CV–4726, 2015 WL 136557, at *7 (N.D.Cal. Jan.8, 2015) ("A claim for *threatened* arrest, seizure or search is not cognizable under the Fourth Amendment."); *Periera v. Lizzio,* No. 09–CV–1024, 2012 WL 1455750, at *2 (M.D.Pa. Apr. 11, 2012) ("[T]hreats of arrest alone are insufficient to make out an 'excessive force' claim under the Fourth Amendment."); *Szalabawka v. Russo,* No. 09–CV–88, 2011 WL 7776786, at *15 (W.D.Pa. Sept. 28, 2011) (holding that the plaintiff did not allege an excessive force claim based on allegations that he was told to "shut up" and was threatened with arrest); *Shuey v. Schwab,* No. 08–CV–1190, 2010 WL 479938, at *4 (M.D.Pa. Feb. 4, 2010) ("[T]he alleged threats to arrest [the plaintiff] standing alone cannot support a claim of excessive force."); *Sherman v. City of Davis,* No. 04–CV–2320, 2008 WL 553632, at *9 (E.D.Cal. Feb. 26, 2008) (granting summary judgment on claims related to threats of arrest), *adopted by* 2008 WL 822180 (E.D.Cal. Mar.26, 2008), *aff'd,* 362 F. App'x 726 (9th Cir.2010), nor is a threat to destroy property, *see United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (treating "[e]xcessive or unnecessary destruction of property in the course of a search" as an unreasonable search violation, rather than an excessive force violation). Therefore, any excessive force claim based on these alleged threats is dismissed.

#### iii. Brandishing Weapons

Next, Richard alleges that several officers had guns pointed at him. (Second Am. Compl. ¶¶ 37–39, 41–43.) He was then made to lay face down and was handcuffed from behind. (*Id.* ¶ 44.) The Troopers then searched Richard, finding a small pocketknife. (*Id.* ¶¶ 46, 49.) He was then placed in the police vehicle, still handcuffed. (*Id.* ¶ 51.) After this point, Plaintiffs do not allege that any weapons were pointed at Richard, although at least six officers had their weapons out. (*Id.* ¶ 80.) The State Trooper Defendants and the Somers Police Defendants are, at the very least, entitled to qualified immunity with respect to their use of guns, as the vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute

excessive force as a matter of law, and Plaintiffs do not allege other facts that could change the calculus. *See Cabral v. City of New York,* No. 12–CV–4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman,* 2013 WL 1248623, at *13 ("Likewise insufficient is [the][p]laintiff's assertion that the officers pointed guns at him. A threat of force does not constitute excessive force."); *Askins v. City of New York,* No. 09–CV–10315, 2011 WL 1334838, at *3 (S.D.N.Y. Mar.25, 2011) ("While the Second Circuit has noted that circuit law could very well support a claim that a gunpoint death threat issued to a restrained and unresisting arrestee represents excessive force, [the] plaintiff's assertion that a gun was pointed at his head cannot be the basis of a claim for excessive force." (alterations and internal quotation marks omitted)); *Aderonmu v. Heavey,* No. 00–CV–9232, 2001 WL 77099, at *3 (S.D.N.Y. Jan.26, 2001) (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct"). Therefore, Plaintiffs' excessive force claim based on the drawing of the guns is dismissed.

*iv. Physical Force*

**\*16** Plaintiffs allege that after Richard was lying face down, with his hands cuffed behind his back, Delaney struck Richard in his back with a fist or foot, causing him pain and to lose his breath. (Second Am. Compl. ¶ 45.) Under the allegations in the Second Amended Complaint, there is no indication that Richard was resisting arrest in any way. Additionally, Plaintiffs allege that later Delaney "roughly grabbed" Sarah's arm when she was unable to open the case containing the key to Richard's gun case. (*Id.* ¶ 82.) Defendants argue that this force used was de minimis and therefore cannot state a constitutional violation.

Defendants are correct that "[a]n arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Greenaway v. County of Nassau,* –––– F.Supp.3d ––––, 2015 WL 1509486, at *9 (E.D.N.Y. Mar.31, 2015) (internal quotation marks omitted) (quoting *Landy v. Irizarry,* 884 F.Supp. 788, 798 n. 14 (S.D.N.Y.1995)). "Such injury need not be severe, however." *Acosta v. City of New York,* No. 11–CV–856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); *see also Kastle v. Town of Kent,* No. 13–CV–2256, 2014 WL 1508703, at *8 (S.D.N.Y. Mar. 21, 2014) (noting that "courts have allowed plaintiffs to recover, even though the injury

caused was not permanent or severe, where the force used was excessive" (internal quotation marks omitted) (quoting *Lemmo v. McKoy,* No. 08–CV–4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar.8, 2011))). Indeed, in *Robison v. Via,* 821 F.2d 913 (2d Cir.1987), the Second Circuit held that while the fact that the plaintiff sustained only minor injuries "may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure [to seek medical care for her alleged injuries] is not fatal to her claim." *Id.* at 924.

Here, Plaintiffs have alleged that Richard suffered an injury from the kick or punch. (*See* Second Am. Compl. ¶ 45 ("Upon information and belief, while he was face down, [D]efendant [Delaney] demanded [Richard] disclose where he kept his guns, striking [Richard] in his back with a fist or foot, causing him pain and to lose his breath.").) Moreover, under the circumstances alleged, Plaintiffs have plausibly alleged that the use of force was objectively unreasonable. When evaluating whether the use of force was reasonable, courts are to consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) ("Because the Fourth Amendment test of reasonableness is one of objective reasonableness, the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." (alteration, citations, and internal quotation marks omitted)); *Burks v. Perrotta,* No. 13–CV–5879, 2015 WL 2340641, at *4 (S.D.N.Y. May 15, 2015) (same). In making this assessment, the Court must examine the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, ... [and must] make allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Tracy,* 623 F.3d at 96 (internal quotation marks omitted). Thus, "[n]ot every push or shove,

even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (citation and internal quotation marks omitted).

**\*17** Here, the nature of the conduct at issue points to it being permissible to use some level of force. However, at the time of the punch/kick, Richard was on the ground, and handcuffed with his hands behind his back. Under the facts alleged, Richard posed no immediate threat to the safety of others. Further, Richard was not actively resisting in any way. Therefore, as alleged, Plaintiffs state a claim for excessive force based on the kick or punch to Richard's back. *See Smith v. Fields,* No. 95–CV–8374, 2002 WL 342620, at \*5–6 (S.D.N.Y. Mar.4, 2002) (denying summary judgment on excessive force claim, and defense, where there was an issue of fact as to whether the plaintiff was slapped and kicked in the head after he was handcuffed). Further, under the facts alleged, no reasonable officer could have thought this use of force was necessary, and thus Delaney is not shielded by qualified immunity. *See id.* (rejecting qualified immunity defense where the plaintiff claimed he was kicked and slapped after being handcuffed).

The Court next turns to the alleged use of force against Sarah. As noted above, an "arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Greenaway,* 2015 WL 1509486, at \*9 (internal quotation marks omitted). Sarah does not allege any injury whatsoever. However, Sarah was not an arrestee, and, under the facts as alleged, there was no reason for the Defendant officers to suspect she was a threat to herself or anyone else. Courts have allowed excessive force claims to go forward even in the absence of injury when the allegedly excessive force was applied to a bystander not suspected of any wrongdoing. *See Piper v. City of Elmira,* 12 F.Supp.3d 577, 595 (W.D.N.Y.2014) (denying summary judgment where "no dispute exist[ed] that [the plaintiff] suffered no physical injury," because "a jury could conceivably find that no force was appropriate in these circumstances and that [the defendant's] two-handed attempt to throw her to the floor was, at the very least, gratuitous and unrelated to any legitimate law enforcement purpose"). Therefore, while the absence of injury may ultimately point to the force not being constitutionally excessive, the Court will not dismiss on this ground.

Turning next to the reasonableness of the conduct, the Court concludes that, as alleged, the conduct at issue, roughly grabbing Sarah's arm, was objectively unreasonable. Sarah was not suspected of any wrongdoing; she did not pose an immediate threat to the safety of the officers or others; and she was not actively resisting arrest. Furthermore, at that point, Richard was handcuffed with his hands behind his back, placed in the patrol car, and searched, (*see* Second Am. Compl. ¶¶ 48–49, 69, 80, 82), and the house had already been searched, (*See id.* ¶¶ 59, 69, 82). As alleged, it is plausible that any force whatsoever used against Sarah was unreasonable, and that no reasonable officer would have thought it necessary. *See Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir.1996) ("It is clear ... that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Bedenfield v. Shultz,* No. 01–CV–7013, 2002 WL 1827631, at \*9 (N.D.Ill. Aug. 7, 2002) ("Using force of any kind on a citizen the officer knows to be innocent is unreasonable."). Therefore, the Motions To Dismiss Plaintiffs' excessive force claims against Delaney based on the punch/kick to Richard's back and his grabbing of Sarah's arm are denied.

### e. Fifth Amendment Claim

**\*18** The State Trooper Defendants move to dismiss any claims Plaintiffs seek to assert based on the continued interrogation of Richard after Richard exercised his right to remain silent and without *Miranda* warnings being given. (*See* Reply Mem. of Law in Further Supp. of the State Defs.' Mot. to Dismiss Pls.' Second Am. Compl. ("State Trooper Defs.' Reply") 8 (Dkt. No. 32).) [10] Plaintiffs allege that Richard declined to respond to interrogation, exercising his Fifth Amendment rights, and that Delaney did not administer *Miranda* warnings, but continued to interrogate him. (Second Am. Compl. ¶¶ 78–79.) Plaintiffs also allege that, in continuing to interrogate him, Delaney threatened to arrest him and Sarah if he declined to cooperate. (*Id.* ¶ 79.) As a result of this interrogation, Richard agreed to disclose the key's location to Sarah. (*Id.*)

Even assuming that Delaney's conduct was unconstitutional, Plaintiffs still have not stated a § 1983 claim. As the Second Circuit has explained, "a § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiffs in a criminal proceeding." *Deshawn E. ex rel. Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998). Even if Plaintiffs have plausibly alleged that Richard was coerced to answer Defendants' questions, Plaintiffs have

not alleged that any inculpatory statements were used against Richard in a criminal proceeding, and therefore this claim must be dismissed. *See Chavez v. Martinez,* 538 U.S. 760, 767, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (rejecting § 1983 claim because the petitioner was "never made to be a witness against himself in violation of the Fifth Amendment's Self–Incrimination Clause because his statements were never admitted as testimony against him in a criminal case"); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 357, 370 (S.D.N.Y.2010) ("In order to bring a § 1983 claim based on such violations, a plaintiff must show that his privilege against self-incrimination was violated, and such a violation cannot be shown where that plaintiff denies making any inculpatory statements that were used against him in a criminal proceeding."); *Rodriguez v. Kelly,* No. 05–CV–10682, 2009 WL 911085, at *3 (S.D.N.Y. Apr. 6, 2009) (holding that coerced incriminatory statements do not violate the Fifth Amendment if not used against the speaker, but that "[a] successful section 1983 claim may arise when a plaintiff is coerced into waiving Fifth Amendment rights, and utters self-incriminating or inculpatory statements later used against him in a criminal proceeding."), *aff'd sub nom. Rodriguez v. City of New York,* 364 F. App'x 702 (2d Cir.2010); *see also Deshawn E.,* 156 F.3d at 346 ("The remedy for a violation of the right against self-incrimination is the exclusion from evidence of any ensuing self-incriminating statements and not a § 1983 action." (internal quotation marks omitted)); *Selvaggio,* 2015 WL 1293007, at *3 n. 9 (same); *LaFrance v. Bemben,* No. 10–CV–4583, 2013 WL 132702, at *7 (E.D.N.Y. Jan. 10, 2013) (same). Therefore, Plaintiffs' Fifth Amendment claim based on the interrogation of Richard is dismissed.

**\*19** In their Surreply, Plaintiffs claim that their allegations about Richard's interrogation should be considered a substantive due process violation under the Fourteenth Amendment. (Mem. of Law in Sur–Reply to Def. State Police's Mot. To Dismiss Pursuant to Rule 12(b)(6) of the FRCP ("Pls.' Surreply") 4–5 (Dkt. No. 34).) In support of this contention, Plaintiffs cite *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). In *Chavez,* the Supreme Court rejected the claim of the petitioner, who claimed that the un-Mirandized interrogation of him violated his rights under the Fifth Amendment's Self–Incrimination Clause. *See id.* at 766–67. However, the Supreme Court also remanded the case to allow the petitioner to pursue a claim of liability based on a substantive due process violation under the Fourteenth Amendment. *See id.* 779–80. Thus, while conceding their Fifth Amendment claim is not viable (leaving

open the question of why it was included in the first place), Plaintiffs now wish to pursue a substantive due process claim. (*See* Pls.' Surreply 5.)

The Court is troubled by this shift in Plaintiffs' theory. Nowhere in Plaintiffs' Second Amended Complaint do Plaintiffs maintain a violation of their substantive due process rights. Instead, Plaintiffs only referenced their procedural due process rights (along with their Second, Fourth, Fifth, and Eighth Amendment rights). (Second Am. Compl. ¶¶ 103–05.) Therefore, the Court dismisses Plaintiffs' Fifth Amendment claim, but gives Plaintiffs leave to amend the complaint to include (if there is a good faith basis under the law to do so) a substantive due process claim.

*f. Eighth Amendment Claim*

The State Trooper Defendants also move to dismiss Plaintiffs' Eighth Amendment claim, arguing that the Eighth Amendment applies only post-conviction. (State Trooper Defs.' Reply 8.) They are correct, and, indeed, Plaintiffs concede this point in their Surreply. (*See* Pls.' Surreply 5.) Because the relevant conduct occurred without either Plaintiff being convicted of a crime-or even charged with a crime-Plaintiffs' claims relating to their treatment are cognizable only as Fourth and Fourteenth Amendment claims, and their Eighth Amendment claim is dismissed. *See Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." (citation and internal quotation marks omitted)); *Lindsey v. Butler,* 43 F.Supp.3d 317, 325–26 (S.D.N.Y.2014) ( "[The][p]laintiff claims that the officers subjected him to excessive force in violation of the Eighth Amendment. The Court must dismiss this claim because the Eighth Amendment attaches only after conviction. Because the excessive force claim arises in the context of a custodial interrogation during the arrest process, the constitutional right at issue derives from the Fourth Amendment." (citations omitted)), *on reconsideration in part,* No. 11–CV–9102, 2014 WL 5757448 (S.D.N.Y. Nov.5, 2014), *reconsideration denied,* 2015 WL 1501625 (S.D.N.Y. Apr.1, 2015); *Bowman v. City of Middletown,* 91 F.Supp.2d 644, 657 (S.D.N.Y.2000) ("[T]he Eighth Amendment right to be free from cruel or unusual punishment applies only to the post-conviction stage."). Plaintiffs acknowledge that their Eight Amendment claim is not viable, but ask to convert it to a Fourteenth Amendment claim. (Pls.' Surreply 5.) Plaintiffs may do so in

a Third Amended Complaint to be filed within 30 days of this Opinion and Order.

### g. Second Amendment Claims

**\*20** The State Trooper Defendants also move to dismiss Plaintiffs' Second Amendment claim. (*See* State Trooper Defs.' Reply 9.) The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The right of an individual to keep and bear arms has been affirmed by the Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. City of Chicago,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). This right, however, is not absolute, *Heller,* 554 U.S. at 602, and within the Second Circuit, "the contours of [the right to bear arms] are as of yet underdeveloped and ill-defined," *Doutel v. City of Norwalk,* No. 11–CV–1164, 2013 WL 3353977, at \*23 (D.Conn. July 3, 2013). Prior to *Heller* and *McDonald,* in *Garcha v. City of Beacon,* 351 F.Supp.2d 213 (S.D.N.Y.2005), *aff'd,* 232 F. App'x 74 (2d Cir.2007), a court in this District held that "the right to bear arms is not a right to hold some particular gun." *Id.* at 217 (internal quotation marks omitted). Since *Heller* and *McDonald,* lower courts in the Second Circuit have continued to follow *Garcha,* noting specifically that when an individual's right to acquire firearms generally has not been infringed, the confiscation of a specific weapon does not constitute a Second Amendment violation. *See, e.g., Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 430 (S.D.N.Y.2013) (relying on *Garcha* in dismissing a Second Amendment claim because "there [was] no allegation that [the][d]efendants' actions ... affected [the][p]laintiff's ability to retain or acquire other firearms or ammunition, and no law [was] cited that infringe[d] on [the][p]laintiff's right to obtain other firearms"); *McGuire v. Village of Tarrytown,* No. 08–CV–2049, 2011 WL 2623466, at \*7 (S.D.N.Y. June 22, 2011) (holding that a police department's seizure of a plaintiff's handgun pursuant to an order of protection did not violate the plaintiff's Second Amendment right to bear arms); *see also Doutel,* 2013 WL 3353977, at \*25 ("Several cases in this circuit have followed *Garcha'* s reasoning post-*Heller* and *McDonald* and have held that where a plaintiff's ability to acquire *other* firearms has not been abridged, a Second Amendment violation has not occurred even despite a seizure of a plaintiff's *particular* firearm.") (emphasis in original); *accord Sutterfield v. City of Milwaukee,* 751 F.3d 542, 571 (7th Cir.2014) ("Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the

power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention."), *cert. denied,* —— U.S. ——, 135 S.Ct. 478, 190 L.Ed.2d 362 (2014); *Walters v. Wolf,* 660 F.3d 307, 318 (8th Cir.2011) (holding there was no Second Amendment violation where the "defendants' policy and action affected *one* of [the plaintiff's] firearms," but did not prevent him "from retaining or acquiring other firearms," but "not foreclos[ing] the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense"). Thus, there is a very real question whether Plaintiffs have adequately pled a violation of the Second Amendment from the mere claim that the police Defendants seized Richard's guns. Indeed, in their Surreply Memorandum, Plaintiffs offered not a single case that addressed the issue or that suggested that the cases cited above should be disregarded.

**\*21** In any event, even if Plaintiffs had pled a plausible Second Amendment claim, the police Defendants would be entitled to qualified immunity. As previously noted, an officer is entitled to qualified immunity if he or she has not violated a clearly established statutory or constitutional right. *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Second Circuit has set forth three criteria of a clearly established right: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.' " *Schubert v. City of Rye,* 775 F.Supp.2d 689, 702 (S.D.N.Y.2011) (quoting *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004)). The State Trooper Defendants and Somers Police Defendants are entitled to qualified immunity for the Second Amendment allegation because, at the very least, it was reasonable for them to assume that they were not violating the Second Amendment by taking action that resulted in the seizure of specific firearms from Richard, where there are no allegations that they prevented him from retaining or acquiring other firearms. Second Amendment law post-*Heller* and *McDonald* is "ill defined" in this context, *Doutel,* 2013 WL 3353977 at \*23, and, the Second Circuit case law that does exist arguably suggests that seizure of a specific firearm does not violate the Second Amendment. Therefore, because the State Trooper and Somers Police Defendants were entitled to rely on these lower court rulings, it was reasonable for them to conclude they was not violating Richard's constitutional right to bear arms by confiscating his firearms. *Doutel,*

2013 WL 3353977 at *25 (holding that "[d]efendants ... are entitled to rely on the holdings of [Circuit and lower court] cases" "[a]bsent authority ... reversing the holdings in [those cases]".). Therefore, the Court therefore dismisses Plaintiffs' Second Amendment Claim. [11]

*4. § 1985 Conspiracy Claim against all Defendants*

The Dunkelberger Defendants and the State Trooper Defendants argue that Plaintiffs have insufficiently alleged a § 1985 conspiracy that would allow Plaintiffs to hold them liable for constitutional violations. (*See* State Trooper Defs.' Mem. 19; Mem. of Law Supporting Mot. To Dismiss ("Dunkelberger Defs.' Mem.") 6–8 (Dkt No. 17).) Plaintiffs allege that the Dunkelberger Defendants agreed to try to have Richard arrested and remove him and his weapons from his home. (Second Am. Compl. ¶ 26.) In particular, they agreed that Gayle would file a false police report alleging that Richard threatened to harm himself and had weapons in the house in the hopes that police would arrest Richard for the weapons and remove him and Sarah from the premises. (*Id.* ¶ 27 .) Gayle reported this false claim, (*id.* ¶ 28), after she "was advised that the troopers would want to enter the home to search and remove the weapons in there but that they could not enter without a warrant unless an emergency existed" and that if Richard "threatened someone at the house, police could use such a threat to search the house for the person threatened and remove both the weapons and [Richard]," (*id.* ¶ 29). [12] Plaintiffs further allege that Gayle had Dunkelberger removed from the home "at the direction of the State Police," and then reported to police that Dunkelberger "might be in danger," (*id.* ¶ 30), and that the State Trooper and Somers Police Defendants conspired with the Dunkelberger Defendants to "use concern over the absence of [Dunkelberger] from the home in order for police to enter [P]laintiffs' home on the preten[s]e of searching for [Dunkelberger], when all the conspirators knew he was not at the residence," (*See id.* ¶¶ 112–13.)

**\*22** "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). "In addition, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations

are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cty. of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (internal quotation marks omitted). The Court holds that Plaintiffs have plausibly pleaded facts, namely that the police Defendants searched the home purporting to look for and protect Dunkelberger when they knew he was not home, tending to show that the police Defendants and the Dunkelberger Defendants had agreed to act in concert to inflict an unconstitutional injury-the unreasonable, warrantless search of Plaintiffs' home. The Court recognizes that Plaintiffs have offered little by way of explanation as to how they believe the police Defendants conspired with the Dunkelberger Defendants, but it is not the Court's job to judge how believable these allegations are, or the likelihood they will be borne out at later stages of this case, but rather to assess whether Plaintiffs have plausibly pleaded the elements of the claim. Although this claim may one day be ripe for summary judgment, the Court denies Defendants' Motions To Dismiss this claim.

*5. Claims against Dunkelberger Defendants*

*a. Mental Hygiene Law*

The Dunkelberger Defendants argue that there is no private right of action under the New York Mental Hygiene Law. (Dunkelberger Defs'. Mem. 8–9.) Plaintiff disputes this, citing exclusively to a Sixth Circuit case interpreting Michigan state law. (*See* Mem. of Law in Opp'n to Defs. Richard Henry Dunkelberger, Merilyn [Gale] Dunkelberger, William Willard Dunkelberger, Benjamin Dunkelberger['s] Mot. To Dismiss 10 (Dkt. No. 26) (citing *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir.1997))). *See also Monday,* 118 F.3d at 1102–03. Of course, the question of whether there is a private cause of action under a Michigan Mental Health Code has no bearing on whether there is a private cause of action under the New York analog. The Court's own research shows that every court to have addressed the issue has held that there is no private right of action under the Mental Hygiene Law, except with respect to one provision not at issue here. [13] *See McWilliams v. Catholic Diocese of Rochester,* 145 A.D.2d 904, 536 N.Y.S.2d 285, 286 (App.Div.1988) ( "The Mental Hygiene Law is a regulatory statute.... No private cause of action is authorized for violations of the Mental Hygiene Law. Although [the plaintiff] is an intended beneficiary of the legislation, a private cause of action should not be implied because it would not be consistent with the legislative scheme."); *see also Byng v. Delta Recovery Servs., LLC,* No. 13–CV–733, 2013 WL 3897485, at *15 n. 3 (N.D.N.Y. July 29, 2013), *aff'd,* 568 F. App'x 65 (2d

Cir.2014); *Sulehria v. New York,* No. 12–CV–21, 2012 WL 1288760, at *10 (N.D.N.Y. Feb. 8, 2012), *adopted by* 2012 WL 1284380 (N.D.N.Y. Apr.16, 2012); *June v. Blair,* No. 09–CV–323, 2010 WL 8522831, at *17 (N.D.N.Y. Sept. 30, 2010), *adopted in relevant part, rejected in part by* 2012 WL 1048463 (N.D.N.Y. Mar.28, 2012); *Byng v. Campbell,* No. 07–CV–471, 2010 WL 681374, at *18–19 (N.D.N.Y. Feb. 24, 2010); *Lombardo v. Holanchock,* No. 07–CV–8674, 2008 WL 2543573, at *10 (S.D.N.Y. June 25, 2008); *Lombardo v. Stone,* No. 99–CV–4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001). In any event, it does not appear that Plaintiffs even seek to assert a claim under the New York Mental Hygiene Law against the Dunkelberger Defendants. Indeed, the only claim related to the Mental Hygiene Law in the Second Amended Complaint is asserted against the New York State Troopers for allegedly misusing the law and for falsifying evidence against Richard. (*See* Second Am. Compl. ¶¶ 131–35 (alleging that the State Trooper Defendants manufactured evidence against Richard and detained him under the law without basis).) For the foregoing reasons, any claim Plaintiffs seek to assert against the Dunkelberger Defendants under the New York Mental Hygiene Law is dismissed.

### b. Conversion

**\*23** "Under New York law, 'conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' " *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC,* 842 F.Supp.2d 502, 514 (S.D.N.Y.2012) (quoting *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.2006)). To state a conversion claim, "the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.,* 888 F.Supp.2d 385, 396 (S.D.N.Y.2012) (internal quotation marks omitted). Plaintiffs have sufficiently alleged such a claim. Specifically, Plaintiffs allege that in or about December 2012, "without knowledge, permission or right, ... an unknown member of the N.Y. State Police, wrongfully, illegally and without the permission or consent of [Richard], released [Richard's] weapons to the [Dunkelberger Defendants], who have since refused to return them to [Richard] despite a demand to do so...." (Second Am. Compl. ¶ 93.) Plaintiffs have thus plausibly alleged that the Dunkelberger Defendants, acting without authorization, exercised a right to ownership over Richard's property, that

Richard made a demand for the property, and that that demand was refused. The Dunkelberger Defendants' Motion to Dismiss this claim is therefore denied.

### c. Cross–Claims

The Dunkelberger Defendants also move to dismiss any cross claims remaining brought against them by the Somers Police Defendants. Their argument, in its entirety, to this is: "For the reasons stated previously, to the extent any claims against Defendants Siegal or Fitzgerald remain after their Motion to Dismiss, the Court should dismiss any cross-claims they raised against the Dunkelberger Defendants." (Dunkelberger Defs.' Mem. 9.) The Somers Police Defendants do not mention this Motion at all, either in their initial Memorandum of Law or in their reply. (*See generally* Somers Police Defs.' Mem; Reply Mem. of Law in Further Supp. of Defs .[ ] Siegal and Fitzgerald's Mot. To Dismiss the Compl. (Dkt. No. 30) .) In reply, the Dunkelberger Defendants assert that "to the extent that [the Somers Police Defendants] still assert cross-claims against all other Defendants, those against the Dunkelberger Defendants should be dismissed." (Reply Mem. of Law Supporting Dunkelberger Defs.' Mot. To Dismiss 7–8 (Dkt. No. 29).) Strangely, though, the Somers Police Defendants *never brought* cross-claims; therefore, there is nothing for the Court to dismiss (or not dismiss).[14]

### III. Conclusion

For the foregoing reasons, the Dunkelberger Defendants', the Somers Police Defendants', and the State Trooper Defendants' Motions To Dismiss are granted in part and denied in part. As to the claims alleged against the State Trooper and Somers Police Defendants, the Court grants Defendants' Motions To Dismiss Plaintiffs' state law claims, Plaintiffs' Fifth Amendment self-incrimination claim, Plaintiffs' Eighth Amendment Claim, Plaintiffs' Second Amendment Claim, and Plaintiffs' excessive force claim, except as to Delaney's alleged use of force against Richard and Sarah as described herein. As to the claims alleged against the Dunkelberger Defendants, the Court grants the Motion To Dismiss Plaintiffs' claim based on the New York Mental Hygiene Law. The Court denies Defendants' Motion as to the unreasonable search claim, the false arrest claim, the excessive force claim against Delaney related to his use of force against Sarah and Richard, the § 1985 conspiracy claim, and the conversion claim. The claims that are dismissed are dismissed with prejudice, as Plaintiffs have already twice amended, including

once in response to Defendants' pre-motion letters raising the arguments addressed in the instant Opinion. *Justice v. McGovern,* No. 11–CV–5076, 2013 WL 1809634, at \*3 (E.D.N.Y. Apr. 29, 2013) ("Although when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint, when the plaintiff is put on notice of the deficiencies in his complaint and fails to correct them in the amended complaint[,] dismissal with prejudice is proper" (brackets, citation, ellipses, and internal quotation marks omitted)); *Tyler v. Liz Claiborne, Inc.,* 814 F.Supp.2d 323, 344 (S.D.N.Y.2011) ("[A]s plaintiff has already amended his complaint twice, dismissal with prejudice is appropriate at this stage in the litigation.") Nonetheless, Plaintiff may file a Third Amended Complaint to the extent permitted herein to add new claims within 30 days of the date of this Opinion and Order.

**\*24** The Clerk of the Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 17, 18, 21.)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5730605

Footnotes

1  Because many of the Parties share the same last name, the Court follows the naming conventions used in the Complaint.

2  In their Opposition, Plaintiffs include facts in their "preliminary statement" not alleged in the Second Amended Complaint. Furthermore, they attach two documents in their Opposition to the Somers Police Defendants' and the State Trooper Defendants' Motions, namely a State Police 911 report and the New York State Police Field Manual regarding mentally ill persons. For the reasons discussed below, the Court disregards any facts not alleged in the Second Amended Complaint.

3  It bears noting that Plaintiffs are not proceeding pro se.

4  The Somers Police Defendants merely argue that they had probable cause to search the home, (*see* Somers Police Defs.' Mem. 5–6), but the existence of probable cause, on its own, is insufficient to justify a warrantless home search. The Somers Police Defendants further claim that Sarah permitted them to enter, thus implying that consent could be another basis for the constitutionality of this search. (*See id.* at 2.) Although Defendants may be able to make this argument at summary judgment, here, Plaintiffs plainly allege that "[a]t no time did [P]laintiffs consent to police entering their home to conduct a search of it or consent to a search of [Richard's] gun safe." (Second Am. Compl. ¶ 101.)

5  Of course, this issue could be re-visited at summary judgment, particularly the claim that Gayle worked with the State Trooper Defendants and Somers Police Defendants to remove Dunkelberger before the search was conducted.

6  The Somers Police Defendants argue generally there was probable cause to arrest. (*See* Somers Police Defs.' Mem. 5–6.)

7  "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *see also Williams v. City of Mount Vernon,* 428 F.Supp.2d 146, 157 (S.D.N.Y.2006) (same). The only difference between § 1983 claims for false arrest and New York claims for false arrest or false imprisonment is that, under § 1983 the "tortfeasor [must] act under color of state law." *Williams,* 428 F.Supp.2d at 157 (internal quotation marks omitted)

8  The Court notes that Plaintiffs' allegations that the Dunkelberger Defendants and the police Defendants conspired to have Dunkelberger removed from Plaintiffs' residence, that Gayle then made the false report, and that the police Defendants then swarmed to Plaintiffs' residence are the only reasons Plaintiffs' claims are surviving the Motions. These claims likely will, at some point, have to be substantiated in order for the case to survive summary judgment.

9  To be clear, the Court rejects both Defendants' argument that Plaintiffs fail to state a false arrest claim, and their argument that they are entitled to qualified immunity. As discussed, taking Plaintiffs' allegations as true, the police Defendants did not have even arguable probable cause to arrest Richard under the MHL.

10  In reply, the State Trooper Defendants argued for the first time that Plaintiff's Fifth Amendment, Eighth Amendment, and Second Amendment claims should be dismissed. (*See* State Trooper Defs.' Reply 8–9.) Although courts normally do not consider arguments raised for the first time in reply, *see, e.g., Mason Tenders Dist. Council of Greater N.Y. v. Fortune Interiors Dismantling Corp.,* No. 12–CV–4253, 2015 WL 4503630, at \*5 n. 5 (S.D.N.Y. July 23, 2015); *Okor v. Borough of Manhattan Cmty. Coll.,* No. 14–CV–1593, 2015 WL 3750630, at \*4 n. 6 (S.D.N.Y. June 16, 2015), the Court has discretion to do so, *see, e.g., Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 252 (2d Cir.2005); *Marks v. Energy Materials Corp.,* No. 14–CV–8965, 2015 WL 3616973, at \*5 n. 11 (S.D.N.Y. June 9, 2015); *Bricklayers Ins. & Welfare Fund Bricklayers Pension Fund v. P.P.L. Constr. Servs. Corp.,* No. 12–CV–3940, 2015 WL 1443038, at \*7 (E.D.N.Y. Mar. 27, 2015); *see also Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela,* 341 F. App'x 722,

724 (2d Cir.2009), and here the Court granted Plaintiffs permission to file a surreply brief addressing these arguments that were raised for the first time in reply, (*see* Dkt. No. 33). Therefore, the Court will consider these arguments.

11    In their Surreply Memorandum, Plaintiffs did not address the qualified immunity defense as it relates to the Second Amendment claim.

12    The Complaint does not allege who advised Gayle of this.

13    New York state courts have held that there is a private right of action under N.Y. Mental Hygiene Law § 33.13, which addresses the confidentiality of medical records. *See Godinez v. Siena Coll.,* 288 A.D.2d 659, 733 N.Y.S.2d 262, 266 (App.Div.2001); *Ace v. State,* 146 Misc.2d 954, 553 N.Y.S.2d 605, 607 (Ct.Cl.1990), *aff'd,* 207 A.D.2d 813, 616 N.Y.S.2d 640 (App.Div.1994), *aff'd,* 87 N.Y.2d 993, 642 N.Y.S.2d 855, 665 N.E.2d 656 (N.Y.1996).

14    Based on the fact that the Dunkelberger Defendants first raised the issue of dismissing cross-claims asserted against them around the time of removal, (Dkt.Nos.1, 5–8), the Court surmises that the claims may have been brought in state court prior to removal.

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Opinion Clarified on Denial of Reconsideration by Blond v. City of Schenectady, N.D.N.Y., December 15, 2010

2010 WL 4316810

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.

Mark W. BLOND, Jr., Plaintiff,

v.

The CITY OF SCHENECTADY, Mayor Brian
Stratton, SPD Chief Chaires, SPD Officer Daniel
McDonald, SPD Officer St. Onge (Phonetic
Spelling), SPD Det. Sherri Barnes, Individually,
and in Their Official Capacities, Defendants.

No. 10−CV−0598.
|
Oct. 26, 2010.

**Attorneys and Law Firms**

Mark W. Blond, Jr., Romulus, NY, pro se.

Alaina K. Laferriere, Carter, Conboy Law Firm, Albany, NY,
Luke C. Davignon, Carter, Conboy Law Firm, Albany, NY,
for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action under 42 U.S.C.
§ 1983 against officials and employees of the City of
Schenectady alleging his constitutional rights were violated
while he was arrested and interrogated by the police.
Defendants now move to dismiss pursuant to Fed.R.Civ.P.
12(c). Plaintiff cross-moves to amend his Complaint.

**I. FACTS**

For purposes of the instant motion, the following factual
allegations are deemed to be true and all reasonable inferences
are drawn in Plaintiff's favor.

On May 4, 2008, Plaintiff walked out the back door of
his house. Defendant City of Schenectady Police Officer
McDonald approached Plaintiff in an aggressive manner and

"nearly broke the plaintiff's arm" before placing him in
handcuffs. Plaintiff did not resist Officer McDonald. Without
being informed of his Miranda warnings or advised of the
charges against him, Plaintiff was placed in the back of
McDonald's car so McDonald could question third parties.
While in the car, Plaintiff asked Officer St. Onge to "disable
his car that was parked in the back yard of the apartment."
Officer St. Onge slammed the door shut in Plaintiff's face.
"[T]he plaintiff made a second attempt to have his property
protected with the same result of officer St. Onge slamming
the police car door shut on the plaintiff." "This made the
already alcohol induced plaintiff angry, in which he began
hitting his head against the police car window (rear passenger
side)." Officer St. Onge observed Plaintiff hitting his head
against the window, but did nothing. Plaintiff hit his head
against the police car window 4–5 times, after which the
window shattered.

Plaintiff was not bleeding and did not sustain any cuts from
having broken the car window. McDonald "ran from the
backyard to the front and tried to rip the plaintiff out of the
window that was broken." McDonald "then decided to open
the police car door, where he and officer St. Onge tried to
push [Plaintiff] into a[f]ire [h]ydrant." "[P]laintiff was instead
pushed by both officer's [sic] to the ground where the glass
was, [where] both officer's [sic] began kneeing the plaintiff
in his lower back and the back side of his neck." Plaintiff's
face was "pressed into the glass on the ground." McDonald
sprayed a can of pepper spray in Plaintiff's face.

Plaintiff was left "on the ground with his face burning in pain"
for approximately 30 minutes until another vehicle arrived to
transport him to the police station. During this time, Plaintiff
asked if he could use the hose to rinse the pepper spray from
his eyes and face. The officers did not respond to Plaintiff's
request.

Plaintiff was transported to the police station where pictures
were taken of his face. After the pictures were taken, Plaintiff
was permitted to rinse his face and eyes. Plaintiff believed
he had glass in his eyes "from the ofICer's [sic] pressing his
face into the glass on the ground." An ambulance was called
and Plaintiff was taken to the hospital. "The nurse flushed out
the plaintiff's eyes and found no glass." "The plaintiff was
released from the hospital feeling dizzy back into the custody
of the Schenectady police, where Defendant Detective Sherri
Barnes question[ed] the plaintiff without his attorney and after
his head injury."

## II. STANDARD OF REVIEW

### a. *Motion for Judgment on the Pleadings*

**\*2** Defendants move for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). A Rule 12(c) motion is "designed to provide a means of disposing of cases when the material facts are not in dispute between the parties." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed.2010). A motion under Rule 12(c) is only useful if "all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." *Id.*

The standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as for a Rule 12(b)(6) motion to dismiss. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Sharpe v. Taylor,* 2009 WL 1743987 at \*6 (N.D.N.Y. June 18, 2009). The Court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Rosner v. Bank of China,* 349 F. App'x 637, 638 (2d Cir.2009). To survive a motion to dismiss, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

The Court recognizes Plaintiff is proceeding pro se and, accordingly, his pleadings are held to a "less stringent standard than formal pleadings drafted by lawyers." *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993) (quoting *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Plaintiff's pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006); *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006); *Forsyth v. Fed'n Employment & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). However, *pro se* litigants are not exempt "from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

### b. *Motion to Amend the Complaint*

Plaintiff cross-moves to file an amended complaint. A party seeking to amend a pleading more than 21 days after the filing of a responsive pleading may do so with the consent of all parties or with leave from the Court. Fed.R.Civ.P. 15(a)(2). Plaintiff was previously advised that:

> Plaintiff may only amend his Complaint by motion that is in compliance with Local Rule 7.1., including a notice of motion and a supporting affidavit. Also, any motion to amend or supplement must be accompanied by an affidavit (*see* L.R. 7.1(a)(2)). Furthermore, "[a]n unsigned copy of the proposed amended pleading must be attached to a motion brought under Fed.R.Civ.P. 14, 15, 19–22." L.R. 7.1(a)(4). This proposed amended pleading must be a complete pleading, which will supersede the original pleading in all respects. *Id.* Plaintiff's proposed amended pleading shall not incorporate by reference any portion of any prior pleading. *Id.*

**\*3** Dkt. No. 9. Although Plaintiff has moved for leave to amend, he has not attached an unsigned copy of the proposed amended pleading to his motion papers and his motion does not "set forth specifically the proposed amendments and identify the amendments in the proposed pleading." Local Rule 7.1(a)(4). Because Plaintiff has not complied with the requirements of Local Rule 7.1, his motion is DENIED with leave to renew.

## III. DISCUSSION

Defendants move to dismiss the Complaint in its entirety. For Plaintiff to succeed on a claim under 42 U.S.C. § 1983 claim, he must prove that the defendant, while acting under color of state law, deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States. *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010); *see* 42 U.S.C. § 1983. A civil rights complaint "must contain specific allegations of fact which indicate a deprivation of constitutional [or federal statutory] rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). A defendant's personal involvement in a § 1983 claim is a prerequisite to an award of damages. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A plaintiff must allege specific facts to demonstrate that a particular defendant was personally or directly involved in the violation. *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001). The requirement of personal involvement may be satisfied by showing that the defendant: (1) personally participated in the violation; (2) was grossly negligent in supervising subordinates who committed the wrongful acts; or (3) exhibited deliberate indifference by

failing to act on information indicating the unconstitutional acts were occurring. *Provost,* 262 F.3d at 154; *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### a. *The City of Schenectady*

The City of Schenectady moves to dismiss the claims against it on the ground that Plaintiff has failed to demonstrate a violation of any rights caused by municipal policy or custom. A municipality may not be held liable under Section 1983 solely on the doctrine of *respondeat superior. Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To be held liable for a constitutional violation, a municipality must have adopted a policy or custom that caused a deprivation of constitutional rights, or it must have directly caused an employee to violate another's constitutional rights. *Monell,* 436 U.S. at 692; *see Ximines v. George Winqate High Sch.,* 516 F.3d 156, 160 (2d Cir.2008). Here, Plaintiff fails to allege sufficient facts to support a reasonable inference that a municipal policy or custom resulted in a deprivation of his rights. Accordingly, Plaintiff's claims against the City of Schenectady must be DISMISSED.

### b. *The Mayor and the Chief of Police*

**\*4** The Mayor and the Chief of Police move to dismiss the claims against them on the ground that Plaintiff failed to plead any personal involvement by them. As previously noted, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). Here, Plaintiff does not allege any facts plausibly indicating that either the Mayor or the Chief of Police Chief were personally involved in any alleged constitutional violations arising from his arrest, incarceration, or prosecution. Plaintiff similarly fails to plead sufficient facts to state a claim under the standards for supervisory liability applicable to § 1983 claims. Accordingly, Plaintiff's claims against the Mayor and the Chief of Police must be DISMISSED.

### c. *False Arrest, Malicious Prosecution, Failure to Provide Miranda Warnings, and Coercive Questioning*

Defendants move to dismiss any false arrest and malicious prosecution claims on the ground that Plaintiff does not allege that the criminal charges were disposed of in his favor. Plaintiff does not allege in his Complaint that any criminal actions against him were disposed of in his favor. While the Complaint does allege facts suggesting that Plaintiff was arrested, it makes no claim that the arrest was without probable cause. Accordingly, any malicious prosecution and false arrest claims must be DISMISSED.

Defendants move to dismiss any claim concerning the failure to administer Miranda warnings on the ground that it does not give rise to a private cause of action for damages. A Section 1983 claim cannot stand solely on the basis of an alleged failure to administer Miranda warnings. *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998) ("[P]laintiffs cannot base a § 1983 claim solely on a law enforcement officer's failure to administer Miranda warnings...."); *Neighbor v. Covert,* 68 F.3d 1508, 1510–1511 (2d Cir.1995) ( "[E]ven if we were to assume that [the plaintiff's] Miranda rights had been violated, that violation, standing alone, would not form a basis for liability under § 1983."). There is no allegation that coercion was applied to obtain a waiver of Plaintiff's rights against self-incrimination and/or to obtain a inculpatory statements or that any such statements were then used against Plaintiff in criminal proceedings. Accordingly, Plaintiff fails to state a claim upon which relief can be granted. *Id.* Further, because it appears that Plaintiff is currently incarcerated for crimes for which he was arrested in May 2008, any such claims may run afoul of the rule set forth in *Heck v. Humphrey,* 512 U.S. 477, 486–89, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (a Section 1983 suit for damages that "would necessarily imply the invalidity of [the plaintiff's] conviction or sentence" is not cognizable, unless the plaintiff can show that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.").

### d. *Inadequate Medical Care*

**\*5** To the extent Plaintiff asserts a Fourteenth or Eighth Amendment claim of inadequate medical care, any such claim must be dismissed because he failed to allege facts plausibly suggesting an unconstitutional deprivation of medical treatment. To establish such a claim, Plaintiff must show that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The deliberate indifference standard contains both an objective element and a subjective element. The former requires that the alleged deprivation of care be sufficiently serious in objective terms: the plaintiff's condition

must present a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. The subjective element requires a showing that the defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm. *Id.*

Here, Plaintiff's allegations against Defendants are insufficient to establish a constitutional deprivation. Plaintiff fails to allege a serious medical condition for which he sought and was denied treatment. Although Plaintiff was sprayed with pepper spray and he was not permitting to rinse his eyes for thirty to sixty minutes, this is insufficient to state a claim. *See Strassner v. O'Flynn,* 2006 WL 839411, at *8 (W.D.N.Y.2006) (and cases cited therein) (exposure to temporary discomfort of pepper spray is not a serious medical need). Plaintiff similarly fails to allege what harm, if any, resulted from the delay in treatment. Moreover, there are insufficient allegations of deliberate indifference to any medical need. Once he was brought to the police station and pictures were taken, Plaintiff was permitted to rinse his face. To the extent Plaintiff complained of glass in his eye (which could constitute a serious medical need), an ambulance was called and Plaintiff was taken to the hospital where a nurse rinsed his eye and did not find any glass. Accordingly, Plaintiff's claim of inadequate medical care must be DISMISSED.

### e. *Excessive Force and Failure to Intervene*

Defendants next move to dismiss the excess force and failure to intervene claims. When evaluating an excessive use of force claim under the Fourth Amendment, "courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Courts measure the reasonableness of the use of force by considering "the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Parmley,* 465 F.3d at 61 (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)).

**\*6** A police officer may use some degree of force when making an arrest, but the amount of force "must be reasonably related to the nature of [the] resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier,* 225 F.3d 161, 166

(2d Cir.2000). The court must examine the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* Dismissing an excessive force claim is appropriate where "no reasonable fact finder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004). For a plaintiff to prevail on a motion to dismiss, he must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995).

Defendants contend that the use of pepper spray by an arresting officer does not by itself rise to the level of excessive use of force. In some cases, an unconstitutional act or injury may be so *de minimis* that the act cannot rise to the level of a constitutional violation as a matter of law. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("[A] *de minimis* use of force will rarely suffice to state a constitutional claim."). The Second Circuit has noted, however, that "infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects ... and, as such, its use constitutes a significant degree of force." *Tracy v. Freshwater,* —— F.3d ——, ——, 2010 WL 4008747 at *7 (2d Cir. Oct.14, 2010). "Accordingly, a number of our sister circuits have made clear that it should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Id.* In *Tracy,* the Second Circuit held that the use of pepper spray on an individual who was handcuffed and was not offering physical resistance could be unreasonable under the circumstances. *Id.* Although Plaintiff admits to being drunk and angry and to having broken out the window of the police car, he also claims to have been handcuffed and placed on the ground with two police officers on top of him at the time he was pepper sprayed. These allegations are sufficient to plausible state a claim for the use of excessive force against the officer using the pepper spray and for a failure to intervene against the officer who was present but failed to intercede. *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988).

of the failure to administer Miranda warnings are
DISMISSED.

In all other regards, the motion to dismiss is DENIED.
Plaintiff's motion to for leave to amend his original complaint
is DENIED WITH LEAVE TO RENEW UPON PROPER
PAPERS.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4316810

## IV. CONCLUSION

**\*7** For the foregoing reasons, Defendants' motion to dismiss
is GRANTED as follows:

    a. the claims against the City of Schenectady, the Mayor,
    and the Chief of Police are DISMISSED IN THEIR
    ENTIRETY; and

    b. and claims alleging malicious prosecution, false arrest,
    the failure to provide medical care, or arising out

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.